THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARION HOLMES, Defendant-Appellant.

First District (5th Division) No. 85—634

Opinion filed May 8, 1987.

564

Debra R. Salinger, of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., James E. Fitzgerald, and William Toffenetti, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MURRAY delivered the opinion of the court:

Following a jury trial, defendant Marion Holmes was found guilty of armed robbery (Ill. Rev. Stat. 1983, ch. 38, par. 18—2(a)) and sentenced to 15 years' imprisonment. On appeal, defendant contends: (1) he was denied his constitutional right to counsel of his choice; (2) he was not proved guilty beyond a reasonable doubt; (3) the trial court erred in refusing to release discovery material to him in violation of his constitutional right to due process; (4) his attorney was incompetent at trial and laboring under a conflict of interest during a post-trial hearing; and (5) his sentence was excessive. For the reasons set forth below, we affirm.

The record discloses that on March 23, 1980, a McDonald's office in Chicago Heights, operated as a clearinghouse for the receipts of eight McDonald's restaurants, was robbed of $13,000 by two men. Defendant was arrested for the crime in January 1982 after his alleged accomplice, Ulrich Williams, implicated him in the robbery.

Prior to trial, the State filed a motion to remove Leo Holt, defendant's privately retained counsel, from representing defendant based on an alleged conflict of interest; Holt had represented Ulrich Williams, the State's key witness, in various criminal proceedings within 12 years of defendant's trial. Defendant filed a memorandum, alleging that no conflict existed and, if one did, he waived his right to conflict-free counsel.

At a hearing on the motion, Holt admitted that he had repre-

sented Williams in 1972 on an armed robbery charge, winning a dismissal at the preliminary hearing; in 1977-78 he represented Williams on a possession of stolen motor vehicle charge, wherein a guilty plea was entered; he possibly represented Williams on two misdemeanor deceptive practices cases in 1969; that five years prior to defendant's trial in 1984 he had had communications with Williams which would be covered by the attorney-client privilege; and that in the early 1970s he had represented Williams' brother. Following extensive argument on the motion, the court ruled that a *per se* conflict existed and, notwithstanding defendant's waiver of any conflict, it removed Holt from the case.

Defendant subsequently retained Isaiah Gant, who was recommended by Holt. Gant filed a motion to allow discovery of a statement made by Ulrich Williams in proceedings in the circuit court of Will County, which allegedly pertained to matters relevant to the armed robbery of the McDonald's office. The State objected to releasing the entire statement to defendant, contending that the material was irrelevant and would jeopardize on-going, unrelated investigations, as well as endanger the safety of certain police informants. Over defendant's objection, the presiding judge, after asking the State to indicate which sections of the statement it felt should be excised, retired into his chambers with the assistant State's Attorney and conducted an *in camera* proceeding to examine the sections in question and to obtain an explanation of the State's objections to the discovery of those sections. Upon his return to open court, the judge stated that the excised material involved investigations which had no facial relationship to the case at bar and granted the State's request to tender the statement to defendant with 12 sections deleted. The excised and unexcised copies of the statement were placed under seal with the court reporter's notes of the *in camera* proceeding to be made available for inspection by this court, if necessary.

At trial, Patricia Skalski, McDonald's bookkeeper, testified that between 10 and 10:30 a.m. on the day of the robbery a short, thin man entered the office and asked her if a car dealer next door was open. She replied she did not know and the man left. Shortly thereafter the same man returned and told her to sit down and be quiet or she would get hurt. Another man, taller and heavier than the first man, then entered, pulling a ski mask over his face as he did so. He asked Skalski if "Tony," another employee, had arrived yet, and she replied that he had not. After taking $10 from her purse, the men told Skalski to continue with her work, and the first man that had entered the office sat down next to her holding a gun.

At approximately 10:30 a.m., Sherry Van Kampen arrived. She entered the office carrying the nightly receipts from four of the eight McDonald's restaurants. The second man took her aside, tied her up, and put her into a doorless closet facing the wall. Two more persons subsequently entered the office and were tied up and put in the closet. Shortly thereafter the men also tied up Skalski, put her in the closet, and then left. Skalski estimated that the incident lasted 15 to 30 minutes.

Skalski later gave the police detailed descriptions of the robbers. At trial, during direct and cross-examination, the descriptions varied somewhat. She told the police that the first man who entered the office, allegedly defendant Holmes, was black, 40 to 45 years old, 5 feet 5 inches to 5 feet 6 inches, 190 to 220 (160 to 180) pounds and wore a black fur coat. She described the second man, allegedly Williams, as being a heavyset individual, weighing 225 (180 to 200 pounds, 5 feet 4 inches to 5 feet 5 inches (5 feet 6 inches to 5 feet 7 inches), 35 to 40 (30 to 40) years old, and wearing tennis shoes and a tan or brown jacket. Skalski further testified that the second "heavyset" man did not have a gun, and, although she initially stated the first man did not "do anything with his face," she later stated that that individual wore a blue or a green mask. Skalski was unable to identify anyone from photographs shown to her after the robbery at the police station and, 1½ years later, she could not identify defendant or Williams from two photographic lineups containing their pictures.

Sherry Van Kampen testified that on the morning of the robbery she delivered $15,000 in money receipts bundled in small sacks to the Chicago Heights office. When she entered the office, she laid the money on a desk. Subsequently, she was confronted by "a short [heavyset] man in a ski mask with a gun," whom she later identified as Williams. She also saw another man with a ski mask near Skalski, whom she later identified as defendant; she described him as "tall, black and armed with a gun." Defendant told Williams to bring the money receipts and Van Kampen's purse to him. Both men then stuffed the sacks of money inside their clothes. At defendant's direction, Williams took $100 from Van Kampen's purse, tied her up with some wire, and put her into a doorless closet which was approximately four feet away from Skalski's desk. Defendant then asked Van Kampen if her husband, Tony, was picking up more money and whether he was driving his blue car. Van Kampen responded affirmatively to both questions.

Van Kampen further stated that shortly thereafter another employee entered the office, was tied up, and was placed in the closet

facing the wall. The employee's brother appeared a little later and was also tied up and placed in the closet. While the two men waited for Van Kampen's husband to arrive, defendant paced back and forth and Williams stood near Skalski. Subsequently, defendant told Williams to tie up Skalski and to put her in the closet. Both men then went from the office to the hallway near the outside door, where they took their ski masks off. Van Kampen stated she had turned away from the closet wall, that both men were about 20 feet away from her, and that she could see them clearly as they stood by the door. She further testified that the tall man, defendant, turned to look back into the building, she saw his face clearly, and that the men remained by the doorway for about another minute while they waited for some dirt bike riders to leave the area outside the office. Van Kampen also observed defendant after he and Williams left the office while they casually walked by the office window, which "looked into the reception area," on their way to the parking lot. Thereafter, Van Kampen, who had loosened her bonds by this time, ran to the window with the intention of seeing the robbers' car. Failing to see the offenders drive off, Van Kampen then called the police. She later determined that the two men had taken $13,000.

When shown two photographic lineups 1½ years after the robbery, which contained defendant's and Williams' pictures, Van Kampen identified both men as the robbers. Each lineup consisted of seven black and white pictures of men photographed from the "shoulders up," and one group contained a picture of defendant and the other a picture of Williams. Van Kampen picked out defendant from the first group and Williams from the second. At trial, she reiterated that defendant was not only the taller of the two robbers but that he was "substantially" taller; she stated that he was about three inches taller than herself or about six feet tall. During cross-examination, however, defense counsel, who was 5 feet 9 inches, asked defendant to stand next to him, and Van Kampen then estimated that defendant was 5 feet 6 inches. On cross-examination, Van Kampen also stated that she had not told the police investigators that the two robbers looked like brothers.

Ulrich Williams, appearing as a State witness, testified that he and defendant robbed the McDonald's office; Williams confessed to the crime 1½ years after the robbery while in the custody of the Lake County, Indiana, police. He identified himself and defendant from the same two groups of photographs later shown to other witnesses. He stated that on the day of the robbery defendant met him at his home. They drove to a McDonald's restaurant located on West-

ern Avenue in Chicago Heights to await the arrival of a third man. When the third man failed to appear 45 minutes later, defendant and Williams decided to go on without him. They proceeded to park their car behind the restaurant and defendant entered the office, which was approximately three doors away. Williams followed defendant into the office 8 to 10 seconds later; both men wore ski masks and were armed. Once inside the office, they waited for the cars bringing the restaurant receipts. Williams waited hidden on the floor behind a desk. When Sherry Van Kampen arrived, defendant confronted her and ordered her over to where Williams was positioned. Williams tied her up and put her in a closet. The men then took some money from Van Kampen's purse and four pouches of currency which she had brought with her. Two young men came in after Van Kampen; both were tied up by Williams and placed in the closet. After a police car drove into and out of the parking lot, both men decided to flee the scene. Skalski was then tied up and placed in the closet. As Williams and defendant prepared to leave the office, they removed their ski masks. Before they could leave, however, some men on trail bikes came into the parking lot, forcing them to remain inside the office a while longer.

Williams further stated that he was 37 years old at the time of the robbery, that he had known defendant since 1968 or 1969, and that he knew defendant's ex-wife and children. He also testified that he had been convicted of the misdemeanor offense of deceptive practices for which he received a $50 fine; a motor vehicle offense for which he received two years' probation; possession of a controlled substance, resulting in 1½ years' imprisonment; and mail fraud, resulting in a one-year work release sentence, five years' probation, and a $25,000 fine, which he never paid. In exchange for his agreement to testify against defendant, the State told Williams it would recommend a six-year sentence for his participation in the armed robbery of the McDonald's office, which Williams ultimately received. Williams further stated that his family had been relocated and had received $2,325 from the State for the payment of one month's rent, security deposit, and plane fare.

Agent Thomas Pritchett, an employee of the Illinois Department of Law Enforcement, was also called as a witness for the State. He testified that he and his partner interviewed Ulrich Williams while he was in police custody in Indiana on November 23, 1981. Two days after their initial questioning of Williams concerning the McDonald's robbery, he confessed to participating in the crime and stated that defendant was his accomplice. Thereafter, Pritchett showed him two

photographic lineups and Williams picked out defendant's and his own pictures. The agents showed the same photographic lineups to Sherry Van Kampen on December 8, 1981, and she also picked out defendant's and Williams' pictures. They then obtained a warrant for the arrest of defendant and, on January 23, 1982, arrested defendant. According to Pritchett, defendant was 5 feet 9 inches and weighed 178 pounds, and Williams was 5 feet 7 inches and weighed 190 to 200 pounds. (The record also discloses that defendant was 47 years old at the time of the robbery.)

Detective N. Galvan, a Chicago Heights police officer, testified on behalf of defendant. He stated that after the robbery occurrence Patricia Skalski gave a detailed description of the offenders, but Sherry Van Kampen did not, except for a statement that she observed two black males exiting the building after they pulled off their ski masks.

Finally, the parties stipulated if Detective John Schmidt, a Chicago Heights police officer, were to testify, he would state that Van Kampen had in fact given him a more detailed description of the offenders shortly after the robbery occurrence, *i.e.*, that the taller of the two men, allegedly defendant, wore a tan coat, was between 35 to 40 years old, 5 feet 6 inches to 5 feet 9 inches tall, weighed 200 to 230 pounds, and that the two robbers "were similar in appearance, possibly brothers."

The jury subsequently found defendant guilty of armed robbery. Defense counsel, Isaiah Gant, filed a motion for a new trial to which defendant added an addendum. Both Gant and defendant alleged that defendant was deprived of counsel of his choice, Leo Holt, and that Gant rendered ineffective assistance as counsel for defendant at trial in failing to cross-examine Williams concerning the possibility that his brother, and not defendant, participated with him in the robbery. The court treated the motion and addendum as a single motion, and Gant argued both, stating that not only had defendant been deprived of counsel of his choice, but that the situation was aggravated by his own incompetence. The trial court denied the motion.

Thereafter, the court conducted a sentencing hearing. In aggravation, the court considered evidence of a murder charge pending in Illinois against defendant, an attempted armed robbery and conspiracy charge pending in Indiana, and defendant's conviction in 1979 for unlawful use of weapons for which he received supervision and was fined $180. In mitigation, defense counsel stated that defendant was married and had two children; he had been drafted into the United States Army and had been honorably discharged; he had been a police

officer for the Chicago Heights police department; and he had worked for General Mills for the last 20 years.

After consideration of the foregoing, the court sentenced defendant to 15 years' imprisonment, especially noting the seriousness of the crime and that defendant was armed during its commission.

## I

On appeal, defendant first contends he was denied his constitutional right to counsel of his choice. Specifically, he argues that the trial court erroneously determined that his original counsel, Leo Holt, had a conflict of interest based upon Holt's previous representation of the State's principal witness in various criminal matters, which defendant could not waive. Defendant further argues that, in fact, no conflict existed "as there had been no concurrent representation of the defendant and the State's witness [Williams]," Holt had no "existing" relationship with Williams, and any confidences Holt may have received from Williams were not related to the armed robbery charge against defendant. Alternatively, defendant contends that if a conflict of interest existed, defendant had an absolute right to knowingly and intelligently waive his right to conflict-free counsel. Conversely, the State argues that the trial court properly disqualified Holt because his representation of defendant would have been prejudicial to both defendant and the State and that an acceptance or rejection of defendant's waiver was within the trial court's discretion.

■ Where defense counsel is shown to have conflicting professional commitments, prejudice is presumed and reversal of a conviction is mandated. If a reviewing court determines that such a *per se* conflict existed, a defendant need not prove any actual prejudice to obtain reversal of his conviction. (*People v. Stoval* (1968), 40 Ill. 2d 109, 239 N.E.2d 441.) As this court stated in *People v. Owens* (1979), 69 Ill. App. 3d 599, 603, 387 N.E.2d 875:

> "Factors which indicate the existence of a commitment amounting to a *per se* conflict include the following: an inability to cross-examine the witness-client effectively due to the possibility of embarrassment to the client or pecuniary detriment to the attorney \*\*\*; the inability to impeach the witness-client due to the attorney's possession of confidential information given him by the witness-client which is subject to a continuing attorney-client privilege \*\*\*; whether an attorney-client relationship continues to exist between the attorney and the witness-client \*\*\*; and, finally, whether the facts indicate the attorney is subject to 'subtle influences' which may have adversely affected his

ability to defend his client \*\*\*. Evidence of such a commitment becomes critical 'only if there exists some nexus between it and the representation of the defendant *from which a possibility of restraint in that representation may be inferred.*' Ehrmann, *The Per Se Conflict of Interest Rule in Illinois*, 66 Ill. Bar. J. 578, 579 (1978)." (Emphasis added.)

Even where there is no showing that an attorney did not conduct the defense of an accused with diligence and resoluteness, "sound policy disfavors the representation of an accused by an attorney with [a] *possible* conflict of interests. It is unfair to the accused, for who can determine whether his representation was affected, at least, subliminally, by the conflict. Too, it places an additional burden on counsel, however conscientious, and exposes him unnecessarily to later charges that his representation was not completely faithful." *People v. Stoval* (1968), 40 Ill. 2d 109, 113, 239 N.E.2d 441.

■ It is also well established that although the right to counsel is absolute and unqualified (U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, sec. 8; Ill. Rev. Stat. 1985, ch. 38, par. 113–3), the right to choice of counsel is limited (*People v. Solomon* (1962), 24 Ill. 2d 586, 182 N.E.2d 736, *cert. denied* (1962), 371 U.S. 853, 9 L. Ed. 2d 87, 83 S. Ct. 94) and will be denied where it unduly interferes with the administration of justice (*People v. Mueller* (1954), 2 Ill. 2d 311, 118 N.E.2d 1; *People v. Spurlark* (1978), 67 Ill. App. 3d 186, 384 N.E.2d 767). A determination of whether a defendant's right to select counsel of his choice unreasonably interferes with the orderly process of judicial administration depends upon the particular facts and circumstances surrounding each case and is a matter which lies within the sound discretion of the trial court. The proper exercise of this discretion requires a weighing of the public need for efficient and effective administration of justice and a defendant's fundamental right to be represented by counsel of his choice. 67 Ill. App. 3d 186, 384 N.E.2d 767.

Here, the trial court's disqualification of Holt due to a conflict of interest was based on the following considerations: that a lawyer owes total loyalty to a client in every case and that Holt would have divided or overlapping loyalties on cross-examination of Williams; "that perhaps Mr. Holt might not be as effective a cross-examiner as he might because he would deliberately avoid areas in cross-examination that he might feel would conflict with his prior relationship with Mr. Ulrich Williams"; the State would "be objecting" during Holt's cross-examination of Williams, alleging that his questions impinged upon his prior relationship with Williams "and the court would be re-

quired to conduct a hearing"; the court would be required to restrict the scope of Holt's cross-examination of Williams more than it would otherwise have to restrict an attorney free of a prior relationship with Williams; there would be a "cloud *** hanging over the proceedings," should defendant be convicted, and defendant would "surely appeal," alleging incompetency of counsel, either in a post-conviction proceeding or on direct appeal, no matter how thorough and careful Holt's cross-examination; that a defendant's right to counsel of his choice is not absolute and the People have a right to have defendant represented by counsel who would not consciously or unconsciously cross the bounds of propriety in cross-examination of a critical State witness by going into matters which were the subject of a prior attorney-client relationship; and the appearance of judicial propriety would be jeopardized were the jury to become aware during trial, which undoubtedly it would, that Holt, defendant's attorney, also previously represented the State's key witness.

The trial court also determined that the lapse of possibly five years from Holt's last in-court representation of Williams in 1978 until the trial of defendant in 1984 was not a significant adverse factor against the State's argument that Holt should be disqualified. Specifically, the trial judge stated:

"I further note that some importance has been attached by the Respondent Holmes to the fact that *** [Holt's in-court representation of Williams] did not occur within the past five years, although the record would reflect there have been some apparent conversations during that period. My position might very well be different if it were possible to sever the interest on a chronological basis. However, the allegations in this case I believe are for an event which occurred some four years ago, did they not? March 23rd, 1980; ***

MR. HOLT: That's right.

* * *

THE COURT: So that the five year passage, in consideration of the fact that the events which are the subject of the prosecution, the five year passage is not significant in that the alleged armed robbery occurred at a period very close in time, perhaps less than one year, from the actual representation of the witness Ulrich Williams. So I don't think the situation is in any way mitigated by the passage of five years since the last actual in-Court representation."

Although the court's one-year reference above is unclear, it appears that the court concluded that Holt's "representation" of Wil-

liams (*i.e.*, the "past five years" of apparently "some" attorney-client communications) occurred from 1979 (one year after Holt's last in-court representation of Williams and one year prior to the 1980 McDonald's robbery) until defendant's trial in 1984 (four years after the robbery and, at the same time, two years after Holt's representation of defendant began in 1982). We further note that the trial court's five-year calculation of Holt's conversations with Williams, which defendant disputes, was based on the following colloquy:

"THE COURT: To your knowledge when is the last time you represented Buddy [Ulrich] Williams?

MR. HOLT: 1976 or '77, whenever that—

THE COURT: I thought that was a '78 case.

MR. ARTHUR [Assistant State's Attorney]: It was disposed of around '78, but it started in '75.

MR. HOLT: That's the last—last case. Whenever I disposed of that matter.

THE COURT: *And to the best of your knowledge you have not represented him in the past five years then.*

MR. HOLT: No.

THE COURT: *Have you spoken to him* other than by leave of Court, at the occasion where he was brought out to the building *in the past five years.*

MR. HOLT: *Oh, sure I have.*

\* \* \*

THE COURT: You have not had occasion — needless to say I don't want to go into the content of that — *but have you represented him on matters which, in fact, did not become the subjects of litigation?*

MR. HOLT: I think a fair answer to that is— Well, let me put it this way, your Honor: *I believe that we have had conversations wherein I received information that is covered by the attorney and client privilege, whether it resulted in representation of Mr. Williams or not."* (Emphasis added.)

The court further examined the possibility of whether Williams was a collateral, rather than a material, witness. In its consideration of this matter, the court stated:

"Before I talk to Mr. Holmes in this matter, one thing that obviously comes to mind is that the State would be in a position, if the Court were to adopt a per se rule in this case, the State would be in a position to bar attorneys from representing particular clients on a case merely by listing one of their former clients on the list of witnesses, or calling that person on

something which was virtually collateral to the case.

So that being the case — I'm not in any way accusing you [the prosecution] of this; I'm just telling you why, when I ask you what I ask you.

I would ask you to make a record what you expect Mr. Williams would testify in the event this matter were called to trial.

What I'm trying to put in the record is how important he is or is not to the People's case against Mr. Holmes."

The State then recited what it expected Williams' testimony would be and the court determined that his testimony would be material, rather than collateral.

Thereafter, the court concluded that "the interests of the State, the interests of society, and ultimately the interests of [defendant] dictate that he be represented by Counsel whose loyalty is unfettered, undiminished, and untainted by any prior *representation* of a person whose interests are adversely and significantly affected and effective upon the interests of [defendant]." (Emphasis added.)

■ We agree with the trial court's conclusion. The court's comments indicate its considered opinion that Holt might be subject to subtle influences because of a continuing relationship with Williams and, correspondingly, be restrained from vigorously cross-examining Williams for impeachment purposes, notwithstanding Holt's assurances to the contrary that he would examine Williams only on matters of public record. It also appears that the court properly inferred that Holt did have a continuing relationship with Williams in light of Holt's admitted receipt of privileged communications from him over a five-year period prior to trial, thus establishing a nexus between his representation of defendant, his continuing relationship with Williams after the armed robbery occurrence in 1980 in which Williams implicated defendant, and the *possibility* of related confidential information relative to the robbery. In light of the foregoing, we see no reason to disturb the trial court's finding that a conflict existed.

Having determined that a conflict existed, we next consider whether the trial judge properly refused defendant's waiver of conflict-free counsel based on his determination, as evidenced by his comments as a whole, that defendant's choice of counsel would unduly interfere with the administration of justice (*i.e.,* limited scope of cross-examination of the State's key witness, additional hearings on the State's anticipated objections, the appearance of judicial impropriety where the jury would become aware that Holt also previously represented the State's key witness, and subsequent "appeal [and, thus, delay in the administration of justice]" as a result of post-conviction

proceedings or direct appeal).

As mentioned above, where a defendant's choice of counsel unduly interferes with the administration of justice, it is within the sound discretion of the trial court to deny that choice and its judgment will not be disturbed absent an abuse of that discretion. (*People v. Spurlark* (1978), 67 Ill. App. 3d 186, 384 N.E.2d 767.) Here, as defendant correctly points out, the cases relied upon by the State concerning this issue are distinguishable from the instant case. In those cases, no issues of a conflict of interest and waiver of that conflict were raised. Instead, they concerned delays in the orderly process of the administration of justice as a result of the defendants' requests for continuances in which to secure other counsel or continuances for the convenience of retained counsel. See *People v. Payne* (1970), 46 Ill. 2d 585, 264 N.E.2d 167; *People v. Solomon* (1962), 24 Ill. 2d 586, 182 N.E.2d 736, *cert. denied* (1962), 371 U.S. 853, 9 L. Ed. 2d 87, 83 S. Ct. 94; *People v. Burson* (1957) 11 Ill. 2d 360, 143 N.E.2d 239; *People v. Spurlark* (1978), 67 Ill. App. 3d 186, 384 N.E.2d 767.

On the other hand, defendant fails to argue this issue with citation to authority. Instead, he merely addresses the issue with allegations, *i.e.*:

> "[T]he right to counsel of choice must be seen as sacrosanct when the defendant does nothing in regards to his counsel to delay or interfere with the judicial process. In the case at bar, the State was clearly responsible for any delay or interference with the efficient administration of justice. Moreover, it must be noted that the State's motion to disqualify Mr. Holt came after Mr. Holt had been representing Mr. Holmes on the instant case for two years."

We find defendant's "argument" without merit. From the above statement, it is unclear what actions by the State delayed or interfered with the efficient administration of justice. We also find defendant's statement concerning Holt's disqualification confusing; defendant admits in his appellate brief that the State filed its motion for disqualification five months after defendant demanded trial and over two years after defendant had been arrested. If this is the delay or interference defendant suggests, we cannot comprehend its import, especially in light of the fact that Holt himself did not bring his prior relationship with Williams to the court's attention until the State moved for his disqualification.

We further note that defendant's continuing argument on this issue is grounded upon defendant's knowing and intelligent waiver of conflict-free counsel. However, neither party disputes defendant's

waiver. Thus, defendant misses the point. Whether defendant made a knowing and intelligent waiver is not the issue—the issue is whether the trial court had discretion to refuse defendant's knowing and intelligent waiver. Accordingly, although defendant's recitation of this area of law is excellent, it is inapplicable to this issue.

■ The parties have cited no other cases involving this particular refusal of waiver issue and our research has failed to disclose any. Accordingly, in light of the well settled rule that a determination of whether a defendant's choice of counsel unduly interferes with the administration of justice is within the sound discretion of the trial court, and no evidence here has been presented to indicate that the trial court abused its discretion based upon its consideration of the particular facts and circumstances surrounding the instant case and a balancing of the interests of defendant and the public, we hold that the court did not improperly refuse defendant's waiver of conflict-free counsel.

We also briefly observe that although defendant was denied his first choice of counsel, he nonetheless exercised his right to choice of counsel in his second selection of Isaiah Gant. Gant was recommended by the lawyer defendant wanted in the first instance, Holt, and defendant had an opportunity to either reject or accept the recommendation. Defendant expressly accepted Gant as his counsel. There is no suggestion that defendant was forced to proceed to trial with less than competent counsel; we have no doubt, and apparently neither did defendant, that Holt would not recommend counsel other than the most able and competent because to do so would place him in a position, professionally, of defending his recommendation. Moreover, we note that defendant had other counsel representing him in another pending matter in which he was charged with two counts of murder. This therefore is not a situation where defendant had no contact with other attorneys who were experienced in criminal law (see *People v. Friedrich* (1960), 20 Ill. 2d 240, 169 N.E.2d 752) and who, without a possible conflict of interest, were available to represent him.

Under the foregoing circumstances, therefore, we hold defendant was not improperly denied his right to counsel of his choice.

## II

Defendant next argues that he was not proved guilty beyond a reasonable doubt because the eyewitnesses' description of the offenders given after the robbery occurrence varied greatly and Williams' identification of him was tainted by a motive for lying.

■ A jury verdict based on conflicting evidence is conclusive when it is founded on credible testimony sufficient to convict. (*People v. Hister* (1974), 20 Ill. App. 3d 933, 314 N.E.2d 562.) It is a rare occasion not to find discrepancies in the testimony of various witnesses to any given chain of events. (*People v. Zaeske* (1966), 67 Ill. App. 2d 115, 213 N.E.2d 577.) Such discrepancies or inconsistencies in the witness' testimony go only to the weight accorded them by the jury. (*People v. Parish* (1980), 82 Ill. App. 3d 1028, 403 N.E.2d 725.) The identification of an accused by a single eyewitness is sufficient to sustain a conviction, provided the witness viewed the accused under circumstances permitting a positive identification. (*People v. Pittman* (1973), 55 Ill. 2d 39, 302 N.E.2d 7.) Whether an accomplice's testimony, corroborated or uncorroborated, is a satisfactory basis for conviction goes to the weight of the evidence and is, therefore, within the province of the jury or the court. *People v. Farnsley* (1973), 53 Ill. 2d 537, 293 N.E.2d 600.

Defendant complains of the discrepancies between Patricia Skalski's description of the armed robbers and Sherry Van Kampen's. He also contends that Van Kampen's height and weight descriptions of the offenders varied immediately after the occurrence and 1½ years later; Van Kampen's description of defendant ranged from describing defendant's height between 5 feet 4 inches to 5 feet 6 inches, his weight between 160 to 230 pounds, and his age between 35 to 45 years.

■ We believe that any discrepancies between the two women's descriptions or inconsistencies in Van Kampen's various descriptions were more than overcome by Van Kampen's identification of the photographs of defendant and Williams from two separate sets of seven photographs when she was individually interviewed 1½ years after the robbery. Furthermore, contrary to defendant's argument, Van Kampen had a clear view of defendant and Williams without their masks, both when they waited to leave the office building and when they casually walked by the office window. Accordingly, we find defendant's argument without merit.

■ We further reject defendant's argument that Williams' testimony was tainted by his motive for lying. Specifically, defendant contends that Williams' testimony lacks an "absolute conviction of truth." (See *People v. Ash* (1984), 102 Ill. 2d 485, 468 N.E.2d 1153.) To the contrary, Williams' testimony was clear and convincing; he made no effort to hide his criminal past, the leniency shown to him, or the support for his family in exchange for his testimony against defendant. Moreover, his testimony was more than sufficiently corrob-

orated by Van Kampen's photographic and in-court identifications of defendant and her testimony concerning material points relative to the robbery.

In light of the foregoing, we therefore hold that defendant was proved guilty beyond a reasonable doubt.

## III

■ Defendant also argues that the trial court erred in refusing to release discovery material to him—Williams' complete statement made in a proceeding in Will County—in violation of his constitutional right to due process. Due process requires that the State disclose to a defendant all favorable evidence which is relevant to his or her guilt or punishment. (*Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194.) Due process does not require, however, that all evidence in the State's possession be turned over to a defendant even if it might be helpful. (*People v. Velez* (1984), 123 Ill. App. 3d 210, 462 N.E.2d 746.) In addition to the requirements that the evidence be favorable and a specific request made for it, the evidence must be material. (*People v. Post* (1982), 109 Ill. App. 3d 482, 440 N.E.2d 631.) When a specific discovery request is made but resisted by the State on the ground that the statement or portions thereof are irrelevant or contain privileged material, "the court must examine the statement *in camera* and determine whether it is or is not properly producible; if necessary excise irrelevant or privileged matter; and turn over to the defendant whatever portion of the statement can fairly be said to be the witness' own words." *People v. Szabo* (1983), 94 Ill. 2d 327, 345, 447 N.E.2d 193.

In the instant case, defendant does not challenge the procedure discussed above, but does argue that defense counsel should have been allowed to attend and participate in the *in camera* proceeding, as well as examine the statement at issue, and, on appeal, he should have been allowed to examine the impounded material in order to prepare argument on this issue. Defendant cites *People v. Buss* (1983), 112 Ill. App. 3d 311, 445 N.E.2d 894, as an "intimation" that it is error to allow one side to be present and participate in an *in camera* proceeding conducted to examine challenged discovery material to the exclusion of the other party.

In *Buss*, the trial court allowed the State to explain *ex parte* what material was being turned over to the court for inspection (*i.e.*, interview notes taken by the State of potential witnesses). On appeal to this court, defense counsel was allowed to examine the notes, which the trial court had held nondiscoverable, in order to perfect his argu-

ment on this issue. The *Buss* court subsequently held that no prosecutorial misconduct occurred where the State's *ex parte* explanation of the material to the trial court was in anticipation of the court's inspection and not during its *in camera* examination of the notes. The *Buss* court further stated, citing *People v. Jenkins* (1975), 30 Ill. App. 3d 1034, 333 N.E.2d 497, that pursuant to Supreme Court Rule 412(a)(i) a requirement that an inspection of such documents take place in the presence of counsel would completely defeat the purpose of *in camera* examinations. The *Buss* court then concluded that "the court's inspection of the documents properly took place to the exclusion of counsel for both sides." *People v. Buss* (1983), 112 Ill. App. 3d 311, 321, 445 N.E.2d 894.

Without resort to defendant's "intimation" theory, we agree that either counsel for both parties should have been allowed to be *present* during the *in camera* proceeding (see *People v. Dace* (1983), 114 Ill. App. 3d 908, 449 N.E.2d 103, *aff'd* (1984), 104 Ill. 2d 96, 470 N.E.2d 993) or both sides excluded (see *People v. Coates* (1985), 109 Ill. 2d 431, 488 N.E.2d 247). Clearly, however, in situations where defense counsel's presence is allowed, he is not entitled to *examine* the disputed material. See *People v. Jackson* (1986), 145 Ill. App. 3d 626, 495 N.E.2d 1207, citing *People v. Jenkins* (1975), 30 Ill. App. 3d 1034, 333 N.E.2d 497.

■ In light of the foregoing, therefore, we find that the *ex parte in camera* proceeding here was improper. Under the circumstances, however, this error was harmless in light of the fact that our examination of the excised material of Williams' statement is, as the trial court concluded, privileged and not favorable or material to defendant.

We disagree, however, with defendant's further contention, relying on *Buss*, that he should have been allowed to examine the impounded material in order to prepare his argument on appeal. *Buss* is distinguishable on this issue from the case before us. In *Buss*, the disputed material consisted of interview notes taken by the State of potential witnesses concerning defendant's case only. Here, Williams' statement contained information of unrelated, on-going investigations and the names of informants in those cases.

We further reject defendant's argument that notwithstanding a potential danger to parties or the confidentiality of pending investigations (see *Alderman v. United States* (1969), 394 U.S. 165, 22 L. Ed. 2d 176, 89 S. Ct. 961), where material is *relevant* to a defendant's case, it must be disclosed. Here, our examination of the disputed excised sections of the statement reveals that the material *is not rele-*

*vant* to defendant and concerns unrelated matters. Moreover, were we to allow defense counsel to examine the material prior to our review, the result would be the same were defense counsel allowed to examine it before *in camera* proceedings in the trial court—vitiation of the purpose of *in camera* examinations. See *People v. Jenkins* (1975), 30 Ill. App. 3d 1034, 333 N.E.2d 497.

▉ Accordingly, we hold that the trial court did not err in refusing to release Williams' complete statement to defendant.

## IV

Defendant's claim of incompetency of counsel must also be rejected. Specifically, defendant contends that his attorney was incompetent at trial and "laboring under a conflict of interest due to his task of arguing his own incompetence during the hearing on his post-trial motion" and, accordingly, defense counsel was under a duty to withdraw as counsel.

▉ To establish ineffective assistance of counsel, a defendant must show that counsel's presentation of his case was so constitutionally deficient that it produced substantial prejudice to defendant without which the result of the proceedings would have been different. (*People v. Royse* (1983), 99 Ill. 2d 163, 457 N.E.2d 1217; *People v. Williams* (1986), 140 Ill. App. 3d 216, 488 N.E.2d 649.) Rather than focusing upon isolated instances occurring during the course of the proceedings, all facts and circumstances set forth in the record must be considered. (140 Ill. App. 3d 216, 488 N.E.2d 649.) Both counsel's incompetence and the resultant prejudice must be clearly established by a defendant. (*People v. Rodriguez* (1983), 117 Ill. App. 3d 761, 454 N.E.2d 13.) A defendant must further overcome a strong presumption that counsel's conduct might be considered sound trial strategy. (*Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052.) Additionally, effective assistance of counsel refers to competent, not perfect, representation. *People v. Balfour* (1986), 148 Ill. App. 3d 215, 498 N.E.2d 547.

▉ Here, the only assertion of incompetence of counsel is that Gant failed to cross-examine Williams concerning the possible participation of his brother in the robbery, rather than defendant. However, there is not an iota of evidence that Williams' brother participated in the crime except for the stipulated, but disputed, testimony of Detective Schmidt that Sherry Van Kampen stated that the two robbers could have been brothers. The fact that this was a possibility and defense counsel did not pursue it does not raise this alleged omission to the level of incompetency where no prejudice to defendant has been

clearly established by him. Additionally, Van Kampen positively identified defendant as one of the two robbers through a photographic lineup prior to trial and in court.

We further observe that defendant's argument is without merit in light of the fact that defense counsel's allegation of incompetency was almost identical to defendant's. Accordingly, this was not a situation in which defense counsel was required to argue as an advocate against himself because, here, he admitted his own alleged incompetency.

Notwithstanding the above, defendant argues that under the circumstances here no showing of prejudice is required where "a *per se* conflict alleging one's own incompetence arises." We also find this argument without merit. The cases relied upon by defendant are distinguishable from the case before us. In all of those cases, only the defendants alleged incompetency of counsel; their attorneys did not, as here. Also, in four of the cases the conflict of interest arose as a result of one public defender being called upon to argue the incompetency of another public defender who represented the defendants at trial and, as a result, the respective courts held that the defendants were entitled to substitute counsel other than from the public defender's office to represent them on the incompetency issue because of the close connection between the public defenders. See *People v. Smith* (1967), 37 Ill. 2d 622, 230 N.E.2d 169; *People v. Morrow* (1985), 132 Ill. App. 3d 584, 478 N.E.2d 25; *People v. Thompson* (1985), 132 Ill. App. 3d 355, 477 N.E.2d 532; *People v. Norris* (1977), 46 Ill. App. 3d 536, 361 N.E.2d 105.

For the same reason, we believe the last two cases cited by defendant are also inapplicable. In *People v. Simpson* (1984), 129 Ill. App. 3d 822, 473 N.E.2d 350, it appears that the defendant had been represented by the public defender's office in light of the fact that the court, in reversing for a new hearing on the defendant's claim of ineffective assistance of counsel, specified that the defendant would be entitled to substitute counsel to represent him at the hearing other than from the public defender's office. In *People v. Krankel* (1984), 102 Ill. 2d 181, 464 N.E.2d 1045, the court held that the defendant, who had originally been represented by a public defender, was entitled to a new hearing with "appointed counsel other than his originally appointed counsel," whom we assume would have been counsel other than another public defender pursuant to the above case law.

On the other hand, as this court observed in *People v. Johnson* (1981), 98 Ill. App. 3d 228, 232, 424 N.E.2d 610, "[w]hether counsel is called upon to argue his own ineffectiveness [citation] is not determi-

native of a conflict of interest based upon defense counsel's incompetence. Instead, the underlying allegation of incompetence determines whether an actual conflict of interest exists." As discussed above, no such conflict of interest existed here in light of the fact that defense counsel admitted his alleged incompetence, and thus was not required to defend his own performance, and defendant has failed to show any prejudice resulting from Gant's "failure" to cross-examine Williams concerning his brother's possible participation in the robbery.

Finally, we briefly note that since Gant was privately retained, defendant could have terminated his representation at will and retained other counsel to represent him at his post-trial hearing. That he did not and now complains of Gant's alleged incompetency and conflict of interest is contrary to his argument that he deserves a new post-trial hearing because Gant was under a duty to withdraw.

Accordingly, we hold that defendant was not denied effective assistance of counsel.

## V

Defendant's last argument is that the trial court abused its discretion in sentencing him to 15 years' imprisonment. He contends that the trial court considered improper aggravating factors and ignored his lack of criminal history, lack of harm done to the complainants, and the fact that he had been a law-abiding citizen for 50 years. The State argues that defendant was properly sentenced in light of the fact that he had pending charges for attempt and conspiracy to commit armed robbery, as well as murder, he threatened the victims with a firearm, he took a leadership role in the offense, and he had a prior conviction for unlawful use of weapons.

It has been consistently held that " 'where it is claimed that the punishment imposed is excessive, although within the limitations prescribed by the legislature, that sentence should not be disturbed unless it is greatly at variance with the purpose and spirit of the law or manifestly in excess of the proscriptions of section 11 of article II of the [1870] Illinois constitution which requires that all penalties should be proportioned to the nature of the offense. The trial court is normally in a superior position during the trial and the hearing in aggravation and mitigation to make a sound determination as to the punishment to be imposed than are courts of review.' *People v. Fox* (1971), 48 Ill. 2d 239, 251-52, citing *People v. Hampton* (1969), 44 Ill. 2d 41, and *People v. Taylor* (1965), 33 Ill. 2d 417; Ill. Const. 1970, art. I, sec. 11." *People v. Barrios* (1986), 114 Ill. 2d 265, 277, 500 N.E.2d 415.

In *People v. Townsend* (1976), 40 Ill. App. 3d 88, 351 N.E.2d 290, this court affirmed a defendant's sentence for armed robbery of 10 to 30 years, notwithstanding the fact that the defendant had no prior convictions and was only 19 years old at the time of the offense. In *People v. Drew* (1975), 32 Ill. App. 3d 682, 336 N.E.2d 281, this court also upheld a defendant's 10-to 30-year sentence for armed robbery, notwithstanding the fact that his accomplice in the crime only received 1 to 3 years on a guilty plea.

In the present case, the crime committed by defendant was a serious, inherently violent and threatening one—an armed robbery. The record discloses defendant was the planner of the crime. We further observe that defendant's accomplice's past criminal history involved nonviolent crimes and, therefore, the fact that his sentence of 6 years was less than defendant's 15 years does not persuade us that defendant's sentence was excessive. We also note that the trial court did not consider the fact that defendant had been a police officer, either in mitigation or aggravation, and only considered one of two unlawful use of weapons charges for which he received supervision because no evidence was presented that defendant's "record of arrest was ever expunged." Finally, the trial court also considered the statutory mandate for armed robbery, a Class X felony. (Ill. Rev. Stat. 1985, ch. 38, par. 18—2.) For such a crime, the legislature has authorized a sentence of not less than 6 years nor more than 30.

▉▉▉ Based on the above, we find no reason to disturb the trial court's determination of sentence and, accordingly, hold that the court did not abuse its discretion in sentencing defendant to 15 years' imprisonment.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

SULLIVAN, P.J., and LORENZ, J., concur.