THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARION HOLMES, Defendant-Appellant.

First District (5th Division)   No. 1—88—3713

Opinion filed November 13, 1992.

Alan D. Goldberg, of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Maureen Harton, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LORENZ delivered the opinion of the court:

Defendant Marion Holmes and codefendant William Franklin were tried separately and convicted of the murder of Elgin Evans. The State's key witness at both trials, Ulric Williams, had been present during the murder. In order to protect the credibility of Williams' testimony at Holmes' trial, the State characterized Williams as an innocent bystander to the murder and further denied that Williams' testimony was in any way motivated by an expectation for prosecutorial leniency concerning his involvement in the murder. Holmes filed this appeal arguing that, in light of the evidence in the record, the State's conduct violated his right to due process. We agree with Holmes and, accordingly, reverse and remand for a new trial.

On February 6, 1980, Elgin Evans was murdered behind the Ford Motor Company plant located on 16th Street in Chicago Heights, Illinois. Three men were present during the murder: Marion Holmes, William Franklin, and Ulric Williams. Holmes and Franklin were tried separately for the murder and Williams testified for the State in each trial.

At Holmes' trial, Williams testified to the following occurrence facts. He had known Holmes for 11 years and the two were close friends. He had also known Franklin for five years, but they did not see each other often. On the first Sunday in February 1980, Williams went with Holmes and Franklin in a car to look for Elgin Evans. Holmes explained to Williams that Evans had ripped-off a gambling game that had been organized by a friend of Holmes, known as "Eddie." They did not locate Evans on that Sunday.

On February 6, 1980, Williams went to Holmes' house in Harvey, Illinois, to do some mechanical work on Holmes' car. Franklin pulled up in front of the house with a passenger in his car. Franklin indicated that the passenger was "Elgin." After Franklin and Holmes talked privately for about 15 minutes, Holmes said that they were all going to go for a ride. While Williams drove the car, Holmes and Franklin discussed a plan to dispose of some stolen auto parts. Holmes also told Evans that he would front him some "product" (cocaine). However, there was no discussion about any harm coming to Evans and Williams did not think that Evans had any reason to fear for his safety.

Holmes directed Williams to drive to a Coca Cola bottling plant in Markham, Illinois, but as they approached the plant, they saw a Markham police car and Williams drove away.

Holmes told Williams to drive to Chicago Heights, where they arrived at the Ford Motor Company plant on 16th Street. Williams parked the car in the loading dock area between two semi-trailer trucks. Williams then turned off the motor and opened the driver's door. Holmes told Williams, "We don't need you for this," and Williams handed Holmes the car keys. Holmes told Evans, "Elgin, give us a hand with this."

Williams watched through his rearview mirror as Holmes, Franklin, and Evans walked to the trunk of the car. Evans was standing between Holmes and Franklin. As the trunk popped open, Franklin and Evans turned their heads to see if anyone was watching. Franklin then removed a small pistol from his coat, held the pistol 12 to 14 inches from the right side of Evans' head, and fired one shot. Evans dropped to the ground. Williams heard the trunk slam shut and then

heard Holmes say, "One more for good measure." Still watching, Williams saw Franklin turn slightly and shoot Evans a second time.

Holmes and Franklin returned to the car. Williams had difficulty starting the car because he was nervous. Holmes asked Williams if he was going to vomit, but Williams said no. As he drove the car away, he saw Evans' body lying in the snow. Holmes directed Williams to drive northbound on the Calumet Expressway. Williams looked in the rearview mirror again and saw Franklin disassemble and clean the pistol. Holmes told Williams to drive slowly over the Cal-Sag Channel bridge allowing Franklin to throw the pistol out of the window. The pistol was never recovered.

Holmes warned Franklin that he would be the first suspect and that he should stay out of sight for a while. Williams returned home, but he did not report the murder to the police.

After the murder, numerous other events occurred which are relevant to this appeal. We set forth those events in chronological order. One month after the murder of Elgin Evans, while Holmes, Franklin, and Williams were still at large, two armed men robbed a McDonald's Corporation clearinghouse located in Chicago Heights the consequence of which caused the law enforcement officials to immediately begin an investigation.

Eighteen months after the armed robbery, Williams was taken into custody in Lake County, Indiana, for questioning on an "unspecified offense." Both Federal agents and the local police were involved in the questioning. Williams was placed into a maximum security cell for two days. During this time, Holmes and another man, Gary Peoples, were taken into custody at the same facility and were placed into cells next to Williams. According to Williams, Holmes threatened to kill him. Fearing for his life and the life of his family, Williams asked to speak to "one of the authorities." Agents James Collier and Tom Pritchett of the Illinois Department of Law Enforcement went to visit Williams. Williams told the agents that he had knowledge of an armed robbery and a murder. Williams had several conversations with the agents in which he implicated himself and Holmes in the armed robbery of the McDonald's Corporation clearinghouse and Holmes and Franklin in the murder of Elgin Evans.

Subsequently, Williams and Holmes were arrested and charged with armed robbery and with murder. Franklin was arrested and charged with murder.

On March 9, 1982, Williams testified for the State at the preliminary hearing on the murder charges against Holmes and Franklin and repeated substantially the same details of the murder as set forth

above. However, the following exchange also occurred between Williams and counsel for Holmes:

"Q. [Defense Counsel:] Mr. Williams, are you—have you been promised any benefits, rewards, or immunities in regard to your testimony here today?

A. [Mr. Williams:] No, I have not.

Q. You have no expectation of receiving any benefits, awards, gifts, or anything else for your testimony here today, is that correct?

A. I don't know how to answer that. When you say expectation, are you talking about what I hope, or what I have been promised?

Q. What you hope?

A. Yes, I do.

Q. And you have discussed that with law enforcement agencies, at least as to what your expectations are, have you not?

A. Yes.

Q. Would you tell his honor what some of those expectations are?

A. I hope that I would be, my part in this particular crime would be considered for the part that it was.

Q. And that is to say you were an innocent bystander to an uncertain event?

A. Yes."

Also at this preliminary hearing, Williams testified that while he was in custody in Lake County, Indiana, the law enforcement officials requested to speak with Williams about the armed robbery and murder, not vice versa. At the end of the preliminary hearing, the court found that probable cause existed to support the murder charges against Holmes and Franklin.

Nine days later, another preliminary hearing was held concerning the murder charge against Williams. After Agents Collier and Pritchett testified for the State, the court found that there was insufficient evidence showing that Williams had the requisite mental state for his accountability for the murder and found that probable cause did not exist. The murder charge against Williams was then dismissed.

Sometime on or before September 21, 1982 (the record does not reflect an exact date), Williams gave a statement to authorities in Will County, Illinois, ostensibly as part of a Federal investigation involving Gary Peoples. In his statement, Williams disclosed information concerning a variety of criminal activities. However, Williams

also disclosed information specifically concerning his own involvement in the murder of Elgin Evans. Williams stated:

"Eddie's lounge had been robbed. They found out who had set it up, his name was Elgin Bogan [it is clear from the record that this was the victim, Elgin Evans]. Holmes was known to be a hit man for Eddie and just a killer anyway. He had, he was the bouncer of the lounge at one time, he shot someone in the lounge, and, uh, it's just known in the Heights that Holmes was dangerous. So when we started asking for Elgin Bogan, people would say, 'Marion, we don't know where Elgin is.' But Elgin's got problems, Eddie got a hit on him 'cuz he knew he robbed his place. In fact, Bogan came to Eddie and told him, he says, 'Man, I hear you think I set that robbery up. I didn't do it, I didn't do it. If you got a hit on me please take it off.' Eddie told him, he says, 'No, I don't know nothing about it.' But now Holmes owes Eddie $8,600 for that cocaine. He took the hit from Eddie. But he couldn't get any, realize any cash from him because he owes the man. So, we went in a couple places, and no one knew me from the Heights, and I would ask for Elgin and people had the plague about that; they knew what was happening. So, maybe three or four days passed by, Holmes had come in from work drunk as usual and left his headlights on and his car wouldn't start. So I'm out there jumping his car when Franklin pulls up in his car with someone in there. He tells us, I got Elgin in the car.

\* \* \*

Holmes had stipulated that he was supposed to whoop his ass or break his nose or something. So we got in Franklin's car and I drove; we went to Chicago Heights.

\* \* \*

Yes, it was actually supposed to have been Holmes' contract. \* \* \* It was Holmes' contract because Eddie paid Holmes x number of dollars and Holmes gave Franklin some cocaine."

However, this statement was *not* used against Williams at his preliminary hearing because, according to the State, the statement was not taken until after his preliminary hearing.

In 1985, Holmes was tried for the armed robbery. Williams testified for the State in this trial. Holmes was convicted and sentenced to 15 years in prison. The conviction and sentence were affirmed on appeal. (*People v. Holmes* (1987), 155 Ill. App. 3d 562, 508 N.E.2d 405; *People v. Holmes* (1990), 141 Ill. 2d 204, 565 N.E.2d 950.) Williams pled guilty to the armed robbery pursuant to which the State recom-

mended and Williams received the minimum six-year sentence. The State also agreed to relocate Williams' family and to pay a portion of the relocation expenses.

The murder trials of Holmes and Franklin commenced in 1988. At the time that Williams offered his testimony in these trials, he had been released from prison and was relocated with his family. Franklin was convicted as the triggerperson in the murder and was sentenced to death (Franklin had also been convicted for an unrelated murder several years earlier but was released from prison). The supreme court affirmed Franklin's conviction and death sentence on direct appeal. *People v. Franklin* (1990), 135 Ill. 2d 78, 552 N.E.2d 743.

Finally, we set forth those portions of Holmes' trial which are directly relevant to his claims on appeal. During opening statements, the State told the jury that Williams was an innocent bystander to the murder and further denied that Williams' testimony was in any way motivated by an expectation for prosecutorial leniency concerning his involvement in the murder. The State explained:

"You will learn that Williams told the State Police detectives about two crimes that he was aware of, an armed robbery that he himself was involved in, and the murder of Elgin Evans.

The evidence will show that those detectives conducted their own, independent investigation of what Mr. Williams had told them and they had, in fact, corroborated the information he gave them. Mr. Williams was, in fact, charged with the armed robbery that he made the police aware of in November 1981. Mr. Williams also was charged with the murder of Elgin Evans and the evidence will show you that he went to a preliminary hearing before a judge and that the court found no probable cause or dismissed that complaint against him and that the evidence was insufficient as to his involvement in the actual plot to murder.

Ladies and gentlemen, the evidence will show that at that point, Mr. Williams reached an agreement with the police authorities and his agreement was that in exchange for his truthful testimony in the Elgin Evans murder trial, the State would recommend that he go to prison for six years on the armed robbery charge that he was facing. The evidence will show you that Mr. Williams did, in fact, plead guilty to the armed robbery that he made the police aware of; that he was sentenced to six years in prison; and that he did serve his time. The evidence will also show that as part of that same agreement, Mr. Williams and his family were relocated to a place of safety."

In other words, the State maintained that the agreement with Williams concerning his testimony against Holmes and his codefendant, Franklin, extended only to the deal on the armed robbery charge and to the relocation of his family.

In defendant's opening statement, counsel reminded the jury that the State's characterization of Williams in its opening statement was not evidence. Counsel cautioned the jury to carefully listen to the testimony presented at trial.

During Williams' direct examination, he admitted that he knew that Holmes was looking for Elgin Evans in order to "break his legs." He also testified that he received "no promises" when he talked to Agents Collier and Pritchett in Lake County, Indiana. He further explained that he was charged with the murder but the charge was dismissed after his preliminary hearing. Williams admitted that he had an extensive criminal record which included the conviction for armed robbery. Williams then described his agreement with the State: "I was told that the State would recommend six years on my armed robbery conviction if I would testify truthfully in this case and the armed robbery case." He added that the State agreed to safely relocate his family and pay for part of the relocating expenses. Williams did not admit, as he did in Holmes' and Franklin's preliminary hearing, that he had multiple discussions with the law enforcement officials about his own involvement in the murder and that he was offering his testimony with the expectation of receiving leniency from the State. At the end of the direct examination, the State published to the jury a certified half-sheet showing the no-probable-cause finding entered in favor of Williams on the murder charge.

On cross-examination, Williams admitted that he spoke with agents of the Federal government while in Lake County, Indiana, and that at the time of the preliminary hearings he was under Federal protective custody. He also admitted to having made the Will County statement but did not recall whether he discussed the murder of Elgin Evans. He thought that he gave the Will County statement *before* his own preliminary hearing. Defense counsel, however, did not impeach Williams concerning the substance of the Will County statement which, as we stated above, described in shocking and graphic detail his own involvement in the murder. Counsel also failed to impeach Williams pursuant to his testimony at Holmes' and Franklin's preliminary hearing. In sum, Williams was never questioned whether he was offering his testimony with the expectation that he would receive leniency from the State concerning his involvement in the murder.

After a brief redirect examination by the State, defense counsel declined to re-cross Williams. We note that at various points during Williams' testimony, Holmes expressed to the court his dissatisfaction with his defense counsel.

After the State rested, defense counsel's motion for a directed verdict was denied. Defense counsel then rested.

During closing arguments, the State conceded that Williams had a questionable "background." However, the State characterized Williams as merely an eyewitness, an innocent bystander, to the murder of Elgin Evans and expressly denied that Williams was accountable for the murder of Elgin Evans.

Defense counsel argued in closing: "[N]obody can believe him, nobody can believe an individual whose only motive is to save himself, save himself to the point where he is going to turn on a guy he has known, *** he turned because he was in trouble." Counsel argued that Williams "cut a real good deal" but did not argue that the deal extended to Williams' involvement in the murder.

During the jury instruction conference, defense counsel did not tender the accomplice instruction and it was not submitted to the jury. After deliberation, the jury found Holmes guilty of murder on a theory of accountability.

Before post-trial motions and sentencing, defense counsel moved to withdraw asserting that there was no communication between him and Holmes and that Holmes did not want him to continue as his attorney. The court permitted defense counsel to withdraw, and the case was continued several times to allow Holmes' new attorney time to review the trial transcript.

The new attorney filed a motion for a new trial asserting that Holmes' trial counsel had been ineffective on a variety of grounds. After a hearing, the trial court denied the motion. Holmes was sentenced to 40 years in prison to be served consecutively with his 15-year sentence on the armed robbery conviction.

This appeal followed.

OPINION

It is well established that a criminal defendant's right to due process requires the State to refrain from misleading the jury. (*Napue v. Illinois* (1959), 360 U.S. 264, 3 L. Ed. 2d 1217, 79 S. Ct. 1173; *Giglio v. United States* (1972), 405 U.S. 150, 31 L. Ed. 2d 104, 92 S. Ct. 763; *People v. Tenny* (1991), 224 Ill. App. 3d 53, 586 N.E.2d 403.) In this case, we must determine whether the State violated Marion Holmes' right to due process by informing the jury that Ulric Williams was an

innocent bystander to the murder and by further denying that Williams' testimony was in any way motivated by an expectation for prosecutorial leniency concerning his part in the murder.

We first address the State's characterization of Williams as an innocent bystander to the murder. A person is criminally accountable for the conduct of another person when, either before or during the commission of an offense, and with the intent to promote or facilitate the commission of that offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of the offense. (Ill. Rev. Stat. 1987, ch. 38, par. 5—2(c).) In this case, the evidence overwhelmingly shows (in fact the State concedes) that Williams performed acts before, during and after the commission of the murder of Evans that support his accountability: Williams helped Franklin and Holmes locate Evans before the crime; he drove the car to the site of the crime, avoiding a police car along the way and carefully parking the car out of view; he watched as both Holmes and Franklin got out of the car with Evans; he watched as Franklin shot Evans in the head and heard the second shot after Holmes said, "One more for good measure"; he drove the car away and watched as Franklin disassembled and cleaned the gun; he drove the car to the point where the gun was disposed of; and after the three men separated, he did not report the murder to the police. The case law supports this portion of our analysis. *People v. Cobb* (1983), 97 Ill. 2d 465, 455 N.E.2d 31; *People v. Carreon* (1987), 162 Ill. App. 3d 990, 516 N.E.2d 372; *People v. Winston* (1987), 160 Ill. App. 3d 623, 513 N.E.2d 1121; *People v. Baker* (1982), 110 Ill. App. 3d 1015, 443 N.E.2d 270.

The question remains, however, whether Williams possessed the requisite *mens rea* at the time he performed the above acts to support his accountability. Although the State does not concede this question, we believe that the evidence overwhelmingly shows that Williams knew that Evans was going to be murdered. The record contains the statement that Williams gave in Will County. As set forth in the excerpt above, this statement shows in graphic and shocking detail that Williams knew that Holmes had a "contract" to "hit" Evans and that Williams assisted Holmes in locating Evans in order to execute the "contract." We add that Williams testified at Franklin's trial that he knew the murder of Evans was a "hit." (See *Franklin*, 135 Ill. 2d at 101, 552 N.E.2d at 753.) Furthermore, Williams admitted in Holmes' trial that he knew that Holmes was looking for Evans in order to "break his legs." It is well established that a person who intends to

promote or facilitate only a battery is accountable for a resulting murder. *People v. Terry* (1984), 99 Ill. 2d 508, 460 N.E.2d 746.

The State cites to Williams' testimony that while he was in the car before the murder the conversation was friendly, there was never any discussion about harm coming to Evans, and Williams did not think that Evans had any reason to fear for his safety. We believe that the State's reliance on this testimony is without merit. It is a matter of common sense that the men in the car would not tip off Evans by discussing what harm would come to him. In addition, it is well established that a witness may be found to have the requisite *mens rea* for accountability despite his protestations to the contrary. *People v. Winston* (1987), 160 Ill. App. 3d 623, 513 N.E.2d 1121.

■ In sum, we believe that the evidence in this record points to one conclusion—Williams was accountable for the murder of Elgin Evans. The State was fully aware of the evidence but persisted in characterizing Williams as an innocent bystander. In fact, at every stage of the trial the State made concerted efforts to emphasize Williams' innocence or deny his accountability. This amounted to misleading the jury. Therefore, we hold that the State violated defendant's right to due process.

We point out that despite the results of Williams' preliminary hearing, the State could have used the Will County statement (whenever it became available) to obtain an indictment from a grand jury. (Ill. Rev. Stat. 1987, ch. 38, par. 112—4.) Instead, the State told the jury that "all of the evidence" had been presented at Williams' preliminary hearing and further led the jury to believe that the no-probable-cause finding was dispositive of his innocence. This strategy compounded the State's violation of defendant's right to due process.

In cases where the State violates a defendant's right to due process, a new trial is required if the violation could in any reasonable likelihood have affected the judgment of the jury. (*Napue*, 360 U.S. 264, 3 L. Ed. 2d 1217, 79 S. Ct. 1173; *People v. Bolton* (1973), 10 Ill. App. 3d 902, 295 N.E.2d 11.) Here, Williams was present during the murder and his testimony provided the jury with the only version of the murder. If the jury understood that Williams was accountable for the murder, there is a reasonable likelihood that the jury could have concluded that Holmes was merely a scapegoat for Williams. Therefore, we believe that Holmes is entitled to a new trial.

■ While we believe that defendant is entitled to a new trial by virtue of the first issue, we nonetheless offer our opinion on the second issue. It is well settled that if a witness offers testimony in exchange for some beneficial treatment from the State, the State must

disclose that information to the jury. (*Napue*, 360 U.S. 264, 3 L. Ed. 2d 1217, 79 S. Ct. 1173; *Giglio*, 405 U.S. 150, 31 L. Ed. 2d 104, 92 S. Ct. 763; *Bolton*, 10 Ill. App. 3d 902, 295 N.E.2d 11.) Here, the State admitted to having an "agreement" with Williams. However, the State maintained that the agreement extended only to the deal on the armed robbery charge and to the relocation of his family. The State denied that the agreement extended to prosecutorial leniency concerning Williams' involvement in the murder. Holmes argues that given the contents of Williams' Will County statement, there is at least a strong probability that the agreement did extend to prosecutorial leniency concerning his involvement in the murder. We tend to agree with Holmes.

Furthermore, our analysis here is not limited to what the State perceived as the extent of the agreement. The State was also required to disclose information about what Williams hoped or expected to receive in exchange for his testimony. (See *Bolton*, 10 Ill. App. 3d at 908, 295 N.E.2d at 16 (the court insisted that the State disclose information about any benefit conferred to a witness "whether he has received, been promised, expects to obtain, or hopes for, leniency or immunity in consideration of his testimony" (emphasis omitted)).) The record in this case contains express evidence that Williams offered his testimony with an expectation for prosecutorial leniency. This evidence appears as part of Williams' testimony during Holmes' and Franklin's preliminary hearing. This testimony indicates that Williams had multiple discussions with the law enforcement officials about his "part" in the "particular" murder of Evans and further indicates that he was offering his testimony with the "hope" or "expectation" that he would receive leniency from the State. We realize that Williams offered these comments about his testimony at the preliminary hearings and that he did not make similar comments about his testimony at Holmes' trial. However, at the time of Holmes' trial, Williams was still subject to prosecution by the State. We see no reason to conclude that Williams' hopes or expectations changed. Most importantly, despite Williams' trial testimony, the State was under a duty to disclose the information concerning these multiple "discussions" which gave rise to Williams' hopes and expectations. We believe that the State's failure to do so violated defendant's right to due process.

Finally, it cannot be said that Holmes waived his right to claim the violations of due process by virtue of his counsel's apparent failures at trial. This same issue arose in *Bolton*. There, defense counsel also failed to address the false information at trial. In light of the af-

firmative duty on the State, the court rejected the waiver argument, stating:

"[T]he prosecutor made no attempt to correct or explain the false testimony by re-direct examination. Instead, he chose to stand by the false testimony and compounded it in his final argument. The prosecutor ably represented the State. His responsibility was not limited to the State. It was also his duty to see that the defendants received a fair trial no matter how guilty they might have been." *Bolton*, 10 Ill. App. 3d at 907, 295 N.E.2d at 15.

In closing, we voice our awareness of the opinion in *People v. Franklin* (1990), 135 Ill. 2d 78, 552 N.E.2d 743, affirming the conviction of Holmes' codefendant. The State has suggested that *Franklin* should control this court's disposition of Holmes' appeal. Our reading of *Franklin* indicates that the issues addressed in this opinion were not addressed or ruled on by the *Franklin* court. Therefore, *Franklin* does not control.

We are careful not to question the State's decision to use Williams as a witness in this case. We are only concerned that the State misled the jury as described above.

Reversed and remanded for a new trial.

McNULTY, P.J., and GORDON, J., concur.