**UNITED STATES of America ex rel. William FRANKLIN, Petitioner,**

v.

**Jerry GILMORE, Warden, Pontiac Correctional Center, Respondent.**

No. 95 C 5038.

United States District Court, N.D. Illinois, Eastern Division.

Feb. 12, 1998.

As Amended April 3, 1998.

Joshua Sachs, Sachs & Drake, Larry Carlson, Chicago, IL, for Plaintiff.

Arleen C. Anderson, Illinois Attorney General, William D. Carroll, Cook County State's Attorney, Chicago, IL, for Defendant.

## MEMORANDUM OPINION
## AND ORDER

SHADUR, Senior District Judge.

William Franklin ("Franklin") has filed a 28 U.S.C. § 2254 ("Section 2254") petition for writ of habeas corpus ("Petition"). Franklin challenges his conviction for murder and the ensuing verdict sentencing him to death.[1] For the reasons stated in this memorandum

---

1. Franklin's execution date has been delayed by the Illinois Supreme Court to enable him to pursue any legal remedies available to him (including his effort to invoke federal habeas corpus relief).

opinion and order, Franklin's Petition is denied and this action is dismissed.

### Facts

Section 2254(d) makes the state court's findings of fact presumptively correct in any federal habeas proceeding. In this instance the factual background stated in the Illinois Supreme Court's opinion on direct review ("*Franklin I,*" 135 Ill.2d 78, 88–93, 142 Ill. Dec. 152, 552 N.E.2d 743, 748–50 (1990)) fairly reflects the record. This opinion therefore adopts and repeats that version verbatim:

> The following evidence was adduced at the guilt phase of the defendants' trial. The body of Elgin Evans, Jr., was discovered in the vicinity of the Ford Motor Company plant in Chicago Heights, Illinois, on February 6, 1980. Dr. Tae An, the pathologist assigned to the case, testified that Evans was shot once in the right side of his head and once in the left side of his chest, and that the cause of his death was multiple gunshot wounds.

> Mose Evans, the victim's grandfather, testified that at approximately 8 a.m. on February 6, 1980, he saw his grandson enter a dirty grey or blue four-door automobile near the intersection of 16th and Hanover Streets in Chicago Heights. He testified that he recognized the defendant in the neighborhood three or four times prior to February 6, 1980. Evans stated that on January 27, 1982, two police officers questioned him and showed him an array of photographs from which he identified the defendant as the driver of the car. On cross-examination, Evans admitted that he had seen the driver for "[n]o more than a second." Evans emphasized that he saw the front of the driver's face, but at a preliminary hearing he testified that he saw only the back of the driver's head and the side of his face.

> Ulric "Buddy" Williams testified that at approximately 9 a.m. on February 6, 1980, a man named Marion Holmes called and asked him to "jump" his car. Williams went to Holmes' residence and worked on the car. A short while later the defendant arrived in a grey, four-door Ford LTD. Williams identified the defendant as the driver of the car. The defendant got out of the car, informed Williams that Elgin Evans was in the passenger's seat, and went inside to speak with Holmes.

> Williams stated that the defendant and Holmes returned a few minutes later and told him that they were going to "take a ride" in the defendant's car. Williams drove, Holmes sat in the passenger's seat and the defendant and Evans sat in the back seat. Williams testified that he had never met Evans, but approximately one week earlier he, the defendant and Holmes looked for Evans, because Evans allegedly set up a robbery of a gambling operation. Williams testified that Evans was under the impression that the defendant was going to supply him with cocaine to sell. Williams further testified that both he and Evans thought that the purpose of the trip was to find a place to dispose of stolen auto parts.

> Williams testified that Holmes directed him to an area near the Ford Motor Company plant in Chicago Heights. Holmes then told Williams, "We don't need you for this," and the defendant told Evans, "Elgin, give us a hand with this." Williams stated that he still was under the impression that they were disposing of stolen auto parts, and that he was acting as a lookout. He stated that the defendant, Holmes and Evans exited and went to the trunk of the car. Williams testified that in the rearview mirror he saw the defendant pull a "small pistol" from his jacket and shoot Evans in the head; he then saw the defendant bend over Evans and heard another gunshot.

> Williams stated that the defendant and Holmes returned to the car and Holmes told him where to drive. As they were driving, the defendant wiped off the pistol and threw it into the "Calumet Sag Channel." Williams drove to the defendant's house, then to Holmes' house, and he did not see either one of them afterwards. In November 1981, Williams was taken into custody in Lake County, Indiana. Williams learned that Holmes was also in custody at the same facility and heard that Holmes planned to kill him. Williams then

told the authorities of the Evans murder. Williams spoke with Agents James Collier and Tom Pritchett of the Illinois Department of Law Enforcement on five or six occasions between November 1981 and January 1982.

Williams agreed to plead guilty to an armed robbery charge, to testify truthfully against the defendant in the instant case, and to testify truthfully against Holmes in two cases. In return, the State agreed to recommend a six-year sentence on the armed robbery plea and to arrange to have Williams' family relocated. After serving three years' imprisonment on the armed robbery sentence, Williams was paroled and relocated with his family.

Williams testified that the State made no promises of leniency with respect to Evans' murder. He stated that he was charged for that murder, but after a preliminary hearing the circuit court found that there was no probable cause to charge him for that offense.

Williams testified that he had three prior felony convictions: in July 1980, he pled guilty to possession of a stolen motor vehicle and was sentenced to two years' probation; in August 1980, he was convicted of possession of a controlled substance and was sentenced to 18 months' imprisonment; and in June 1981, he was convicted of mail fraud, fined and placed on work release.

Agent James Collier of the Illinois Department of Law Enforcement testified that he and Agent Tom Pritchett met with Williams on several occasions between November 1981 and January 1982. Collier also testified that he conducted a photo lineup at Mose Evans' home in January 1982, and Evans identified the defendant as the driver of the car that his grandson entered in February 1980.

The defense rested without presenting any evidence. A jury found the defendant guilty of the murder of Elgin Evans, Jr. Following the conviction, the State requested a hearing to determine whether the death penalty should be imposed. After the first stage of the sentencing hearing, the same jury found that the defen-

dant was at least 18 years of age at the time of the offense (Ill.Rev.Stat.1979, ch. 38, par. 9–1(b)), and that there was one statutory aggravating factor in existence rendering the defendant eligible for the death penalty (Ill.Rev.Stat.1979, ch. 38, par. 9–1(b)(3)(the defendant was convicted of murdering two or more individuals)). At the second stage of the sentencing hearing, the State presented the following evidence in aggravation. In December 1982, the defendant was convicted and sentenced to a term of 100 to 300 years' imprisonment for the 1976 murder of James Roland. Terrence Burns, an assistant State's Attorney involved in that case, recounted the evidence adduced at the trial. Seven color photographs of Roland were also introduced into evidence.

The State presented additional evidence in aggravation. In June 1965, the defendant pled guilty to possession of a narcotic drug and was sentenced to three years' probation. In October 1965, the defendant pled guilty to bank robbery and was sentenced to 15 years' imprisonment, but was released after serving five years' imprisonment. Finally, the evidence adduced during the guilt phase of the defendant's trial was introduced into evidence by way of stipulation.

The defendant presented the following evidence in mitigation. Seven of his children testified that the defendant has been a positive influence in their lives. All seven had completed high school, several had attended college, and all seven were employed.

After considering all of the evidence in aggravation and mitigation, the jury found that there were no mitigating factors sufficient to preclude the imposition of the death penalty.

Holmes was tried separately and convicted of first-degree murder for his role in Evans' death, largely on the basis of Williams' testimony. On direct appeal, however, the Illinois Appellate Court (*People v. Holmes*, 238 Ill.App.3d 480, 179 Ill.Dec. 607, 606 N.E.2d 439 (1st Dist.1992), *leave to appeal denied*, 149 Ill.2d 655, 183 Ill.Dec. 866, 612 N.E.2d 518 (1993)) concluded that the prosecution

had violated Holmes' right to a fair trial by misleading the jury about Williams' involvement in the murder. As a result the Appellate Court granted Holmes a new trial.

### Procedural History

After his trial Franklin first appealed directly to the Illinois Supreme Court, which affirmed both his conviction and death sentence in *Franklin I*. Franklin's petition for rehearing from that unanimous opinion was denied, as was his ensuing petition to the United States Supreme Court for a writ of certiorari (*Franklin v. Illinois*, 498 U.S. 881, 111 S.Ct. 228, 112 L.Ed.2d 182 (1990)).

Next Franklin sought relief under the Illinois Post–Conviction Hearing Act (725 ILCS 5/122–1 through 5/122–7), represented by his present counsel (who had not handled the trial or the direct appeals). After an evidentiary hearing as to one of Franklin's post-conviction claims, the original trial judge dismissed all 15 of those claims on May 4, 1993, followed by the denial of his petition for reconsideration. On June 22, 1995 the Illinois Supreme Court affirmed the judgment of the Circuit Court denying the post-conviction claims ("*Franklin II*," 167 Ill.2d 1, 212 Ill.Dec. 153, 656 N.E.2d 750 (1995)), rejecting all eight of Franklin's claims over the dissent of Justice McMorrow as to one claim. Something over three months later that court denied Franklin's petition for rehearing. Finally, the United States Supreme Court denied Franklin's petition for a writ of certiorari (*Franklin v. Illinois*, 517 U.S. 1122, 116 S.Ct. 1357, 134 L.Ed.2d 524 (1996)).

**2.** Because the Petition was filed after April 24, 1996, *Lindh v. Murphy*, —— U.S. ——, 117 S.Ct. 2059, 2063, 138 L.Ed.2d 481 (1997) holds that it is governed by the amendments to Section 2254 in the Antiterrorism and Effective Death Penalty Act of 1996 ("Act") (Pub.L. No. 104–132, 110 Stat. 1214). While Franklin filed a motion for the appointment of counsel well before the effective date of the Act (on September 1, 1995), *Holman v. Gilmore*, 126 F.3d 876, 879–80 (7th Cir.1997) holds that the filing date of the Petition, and not the earlier date that Franklin moved for legal assistance, determines whether he is subject to the Act's amendments.

**3.** In fact Franklin's able counsel have structured the "Claims" portion of the Petition, as well as their Reply to Warden Gramley's Answer, by dividing their contentions into seven sections.

On August 26, 1996 Franklin filed his Petition seeking federal habeas relief from this Court under Section 2254.[2] He advances six constitutional bases as the predicates for his claims of unlawful detention:[3]

1. Franklin's due process right to receive a fair trial was violated when the prosecution misled the jury about the extent of Williams' involvement in the murder of Evans.

2. In refusing to allow Franklin to estop the prosecution from relitigating issues decided in the prior case involving Holmes (to which it will be recalled that Franklin was not a party), the Illinois Supreme Court violated Franklin's double jeopardy rights under the Fifth Amendment.[4]

3. Franklin was denied effective assistance of counsel at trial because his lawyer did not impeach Williams effectively, did not tender an instruction to the jury that Williams was an accomplice in the murder and did not object to improper closing arguments by the prosecution.

4. Franklin was denied his rights under the Eighth and Fourteenth Amendments when the trial judge failed to tell the jury at the sentencing hearing that a natural life sentence was the only alternative to the death sentence and when the prosecution therefore misled the jury about Franklin's potential for future dangerousness.

But the manner in which they have argued those contentions in the Reply has actually rechanneled their submission in a manner that is best dealt with in the way that this Court has labeled and addressed all of their arguments in the text. Though the phrasing that follows in the text is thus a bit different from the phrasing in Franklin's section headings, the discussion here touches all of the necessary bases.

**4.** As always, this opinion adheres to the conventional and convenient (though technically imprecise) practice of referring to the underlying Bill of Rights provisions (which of course impose limitations only on the federal government) rather than to the Fourteenth Amendment (which applies to state actors and has been construed to embody such Bill of Rights guaranties).

5. At the sentencing stage the trial judge inaccurately and incorrectly instructed the jury that its verdict, whether for or against a death sentence, had to be unanimous, in violation of Franklin's rights under the Eighth and Fourteenth Amendments.

6. Franklin was denied effective assistance of counsel at his sentencing hearing because his attorney did not adequately investigate and prepare evidence in mitigation, did not object to improper arguments by the prosecution and did not tender a jury instruction that the only alternative to the death sentence was natural life without possibility of parole.

### *Procedural Framework*

■ Before any federal court can address the merits of a Section 2254 petition, the petitioner must have both exhausted his state remedies and avoided any procedural defaults (*Bocian v. Godinez,* 101 F.3d 465, 468 (7th Cir.1996)). Claims are exhausted "by either (a) providing the highest court in the state a fair opportunity to consider the constitutional issue, or (b) having no further available means for pursuing review of one's conviction in state court" (*Wallace v. Duckworth,* 778 F.2d 1215, 1219 (7th Cir.1985) (per curiam)). Because it is clear from the procedural history here that Franklin satisfies the second of those alternatives, this opinion turns to the separate doctrine of procedural default.

■ While "failure to exhaust ... refers only to issues that have not been presented to the state court but still may be presented" (*Resnover v. Pearson,* 965 F.2d 1453, 1458 (7th Cir.1992)), procedural default occurs either (1) when a state court has declined to address a prisoner's federal claims because the prisoner failed to meet an independent and adequate state procedural requirement (*Coleman v. Thompson,* 501 U.S. 722, 729–30,

111 S.Ct. 2546, 115 L.Ed.2d 640 (1991)) or (2) when a claim could have been but was not brought before a state court and can no longer be asserted in that forum (*Resnover,* 965 F.2d at 1458).

■ Once· barred on procedural default grounds, a claim will not be cognizable in a federal habeas proceeding unless the petitioner can clear one of two hurdles established by *Coleman,* 501 U.S. at 750:

We now make it explicit:· In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

Thus it is necessary at the outset to determine which if any of Franklin's claims are procedurally defaulted and whether Franklin may avoid the procedural bar to any such claims by demonstrating either cause and prejudice or a fundamental miscarriage of justice.

Any claims that manage to survive the intricate procedural obstacles that may preclude relief as a threshold matter must then satisfy Section 2254's stringent standard for granting habeas claims that the state courts considered and rejected on their merits. Section 2254(d)(1) reads: [5]

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable

---

5. Franklin interprets Section 2254(d)(1) as controlling only claims that were resolved on the merits by state courts. That is correct as far as it goes. But Franklin's counsel attempt to stretch that proposition to suggest that any of his claims *not* resolved on their merits by the Illinois Supreme Court—that is, his claims rejected on pro-

cedural grounds—are therefore given de novo review by this Court. That is patently wrong. Section 2254's standard of review does not apply to procedurally barred claims because federal habeas courts may not even address the merits of those claims, let alone give them de novo review.

application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

■ Franklin has not challenged any determination of the facts as made by the Illinois courts. Instead he claims that he is the victim of numerous unreasonable applications of law. Section 2254(d) provides only limited review of state decisions in that regard, for its " 'unreasonableness' standard allows the state court's decision to stand if it is one of several equally plausible outcomes" (*Hall v. Washington*, 106 F.3d 742, 748–49 (7th Cir.1997)).

### Due Process Claim

Franklin's central plea for habeas relief contends that the prosecution violated his due process rights by misleading the jury about Williams' real involvement in the Evans murder. Franklin did not advance that due process claim on direct appeal, instead raising the issue for the first time in his post-conviction review petition. That delay proved costly, for it led the Illinois Supreme Court to rule that Franklin had waived the claim [6] for failure to bring it on direct review (*Franklin II*, 167 Ill.2d at 15, 212 Ill.Dec. 153, 656 N.E.2d at 756). After further deciding that "the doctrine of fundamental fairness does not support relaxation of the waiver rule" for Franklin, the Supreme Court denied Franklin's due process claim without reaching its merits (*id.*).

Franklin nonetheless asserts that he is not bound by the procedural bar identified in *Coleman*. That bar applies only to issues decided pursuant to independent and adequate state grounds of decision (*Coleman*, 501 U.S. at 750). Here there is no question that waiver generally constitutes an independent and adequate state law ground for *Coleman* purposes (*Aliwoli v. Gilmore*, 127 F.3d 632, 634 (7th Cir.1997)), but Franklin challenges the adequacy of *Franklin II*'s application of Illinois waiver law to his claim.

■ Franklin argues that the *Franklin II* determination that he waived his due process claim relied on legal rules that were not firmly established in state practice. State court decisions are not adequate to bar federal habeas review unless they rest upon "firmly established and regularly followed state practice" (*James v. Kentucky*, 466 U.S. 341, 348–51, 104 S.Ct. 1830, 80 L.Ed.2d 346 (1984)). In practical terms, the state rule at issue "must have been 'firmly established and regularly followed' by the time as of which it is to be applied" (*Ford v. Georgia*, 498 U.S. 411, 424, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991)). Analysis of those standards requires close scrutiny of Franklin's allegations and the ruling of the Illinois Supreme Court. In that regard Franklin contends that the prosecution violated his due process rights by misleading the jury in two ways.

First, he says that the prosecution implied that because murder charges against Williams had been dismissed for lack of probable cause, Williams was judicially cleared of Evans' murder. Franklin points out that the no-probable-cause finding had been made without the benefit of a statement that Williams made to Will County police in which he potentially incriminated himself as an accomplice to the crime and contradicted his trial testimony.[7] Because Williams could still be indicted on the basis of that statement, Franklin argues that it was improper for the prosecution to imply that Williams had been found innocent of the murder.

---

6. Because waiver connotes the intentional relinquishment of a known right, it is of course more accurate to characterize the kind of situation described in the text as a forfeiture and not a waiver (see, e.g., *United States v. Ottersburg*, 76 F.3d 137, 138 (7th Cir.1996)). But because the waiver locution is so frequently used in the case law, this opinion will adhere to that usage in referring to cases that have done the same.

7. Williams acknowledged in that statement that when he and Holmes had been searching for Evans in the days prior to the murder, "Holmes had stipulated that he was supposed to whoop [Evans'] ass or break his nose or something." But as set out in the factual account in *Franklin I*, at trial Williams told a different story—he maintained that he thought that the purpose of the car ride with Evans, Holmes and Franklin was to dispose of stolen auto parts, not to kill Evans.

Second, Franklin claims that the prosecution did not disclose to the jury that Williams expected leniency for his involvement in Evans' murder in exchange for his testimony implicating Franklin. Williams admitted at trial that he received a lighter sentence on a separate armed robbery charge in exchange for a guilty plea and an agreement to testify truthfully against Holmes and Williams. At a joint preliminary hearing for Franklin and Holmes, however, Williams also said that he hoped for leniency on the murder charge as well. Franklin argues that if the jury had known about that expectation, it could reasonably have decided that Williams had struck an additional bargain with the prosecution to ensure that he would not be charged with being an accomplice in the Evans murder.

Franklin had access to both the Will County statement and the transcript of Williams' joint preliminary hearing testimony during trial. In fact, his attorney even attempted to question and impeach Williams with both documents, but neither document was ever made a trial exhibit, published to the jury or placed in the common law record. Franklin argued in his post-conviction appeal (and argues again before this Court) that the absence of those documents from the record before the Illinois Supreme Court prevented him from asserting his due process claim on direct appeal. Hence he contended (and still contends) that his later post-conviction proceeding was the appropriate forum in which to raise the issue.

Those arguments failed before the Illinois Supreme Court. After noting Franklin's access to the records during the trial and his defense counsel's attempt to question and impeach Williams with them, that Court ruled that he could have brought the claim on direct review (*Franklin II*, 167 Ill.2d at 15, 212 Ill.Dec. 153, 656 N.E.2d at 756). *Franklin II, id.* also pointed out that Holmes had raised those same issues on direct appeal in his case, stating that Franklin could have done the same. Indeed, Holmes had also

failed to enter either the transcript or the Will County statement into evidence at trial, but he was granted leave under Illinois S.Ct.R. 329 ("Rule 329")[8] to supplement the record with copies of the documents.

Franklin disputes whether firmly established Illinois law at the time of his appeal allowed him to supplement the record under Rule 329. To that end he cites a number of Illinois civil cases that have interpreted Rule 329 narrowly, most relevantly *Nameoki Township v. Cruse,* 155 Ill.App.3d 889, 108 Ill.Dec. 503, 508 N.E.2d 1080 (5th Dist.1987). *Nameoki* refused to supplement the record with material that had not been filed in court or considered by the trial judge, lest such supplementation might "transmute [Rule 329] into an authorization for trial *de novo* in the reviewing court" (*id.* at 895, 108 Ill.Dec. 503, 508 N.E.2d at 1084, quoting *People v. Carroll,* 49 Ill.App.3d 387, 396, 364 N.E.2d 408, 415 (1st Dist.1977)). Franklin complains that Illinois law at the time put him between the proverbial rock and hard place: Either he had to bring his due process claim on direct appeal and thus risk losing his Rule 329 motion to supplement the record, in which case the court might decide on the claim with an incomplete record, or he had to wait to bring the claim on post-conviction review and thus risk having forfeited the claim by not raising it earlier. Franklin says that *Franklin II* resolved that dilemma by forcing defendants to accept the risk of losing a Rule 329 motion, but he concludes that because that rule was not firmly established before his direct appeal it was not an adequate state ground of decision.

But that contention obscures the fact that Franklin's counsel, and not the state of the law in Illinois, were responsible for putting him in that potential quandary. Franklin's trial counsel neglected to enter the crucial documents into the record despite having questioned and impeached Williams with them. That omission was then compounded by the failure of Franklin's appellate counsel

---

**8.** That Rule states in relevant part:
The record on appeal shall be taken as true and correct unless shown to be otherwise and corrected in a manner permitted by this rule. Material omissions or inaccuracies or improper authentication may be corrected by stipulation of the parties or by the trial court, either before or after the record is transmitted to the reviewing court, or by the reviewing court or a judge thereof.

to attempt to use Rule 329. In effect, Franklin is trying to excuse his lawyers' failure to try to supplement the appellate record by focusing on the original failure to put the documents into the record in the first place.

Franklin also overstates the state of uncertainty in Illinois law during his direct appeal. At that time Illinois courts in criminal cases had treated Rule 329 as "a very broad provision" that is "designed to facilitate the amendment of the record on appeal" (*People v. Petty*, 160 Ill.App.3d 207, 211, 112 Ill.Dec. 72, 513 N.E.2d 486, 489 (3d Dist.1987), citing *People v. Chitwood*, 67 Ill.2d 443, 10 Ill.Dec. 565, 367 N.E.2d 1331 (1977)). Further, because there was no danger of "authorizing a trial de novo" on appeal—after all, the disputed material had been before the trial judge and had been raised at trial—*Nameoki* did not foreclose the availability of Rule 329 to Franklin. Holmes' counsel, faced with the identical problem, had no difficulty in using Rule 329 to add Williams' Will County statement and preliminary hearing testimony as part of the appellate record in his case.

Finally, it is not clear that Franklin even needed to use Rule 329 to supplement the appellate record. When he asked that the Illinois Supreme Court read Williams' Will County statement to ensure that Franklin had received a properly redacted version at trial, that Court did so despite the absence of the statement from the appellate record (*Franklin I*, 135 Ill.2d at 93–94, 142 Ill.Dec. 152, 552 N.E.2d at 750). Thus Franklin's counsel did raise other issues on direct appeal that depended upon the same missing documents that he now claims prevented him from bringing his due process claim. That undercuts any notion that Franklin was paralyzed by uncertainty as to what Illinois law demanded that he do to resolve his evidentiary problem.

In sum, while Franklin may perhaps have faced a procedural dilemma (albeit of his own making) as to whether to bring his due process claim on direct appeal, Illinois law provided a solution to his problem. Accordingly *Franklin II*'s application of the waiver doctrine to Franklin's due process claim did rely upon firmly established state practice, and Franklin's due process claim is procedurally barred unless Franklin can escape via either of the *Coleman*-identified routes.

As stated earlier, *Coleman*'s first potential exception to a procedural bar requires Franklin to show that he had cause for the default and suffered prejudice from the constitutional violation. Franklin asserts that ineffective assistance of counsel provides "cause" for his failure to raise his due process claim on direct appeal and for his failure to try to supplement the trial record. Ineffective assistance of counsel, in addition to constituting a claim that may be included in a habeas petition, may itself provide cause that could excuse default for *Coleman* purposes (*Barnhill v. Flannigan*, 42 F.3d 1074, 1078 (7th Cir.1994), citing *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986)).[9]

"Generally speaking, the performance of appellate counsel is assessed using the same standards applied to trial counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)" (*Mason v. Hanks*, 97 F.3d 887, 892 (7th Cir.1996)). Therefore, to make a showing sufficient to establish cause Franklin must demonstrate that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance" (*Strickland*, 466 U.S. at 690). Counsel's actions are reviewed with the strong presumption that "the challenged action 'might be considered sound trial strategy'" (*id.* at 689, quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). Even an unreasonable error on the part of counsel does not warrant setting aside a judgment "if the error had no effect on the judgment" (*id.* at 691).

Franklin's appellate counsel raised fully 22 issues on direct appeal to challenge aspects of both Franklin's trial and sentencing, an effort that of course scotches any notion of per se ineffectiveness. That

---

**9.** To the extent that Franklin asserts ineffective assistance of his appellate counsel as an independent claim in addition to its constituting a purported showing of cause, that claim fails for the same reasons that are set out here.

said, no evidence in the record explains directly why that counsel did not also raise Franklin's claim that the prosecution misled the jury about Williams' role in the murder and his expectation of leniency. So a determination of whether Franklin's appellate counsel acted within the acceptable range of competent assistance requires a pragmatic assessment of the strength of the omitted claim. If counsel omitted raising "a significant and obvious issue" without a legitimate strategic purpose, then Franklin suffered from deficient representation (*Mason*, 97 F.3d at 893). As *Mason, id.* continued, quoting *Gray v. Greer,* 800 F.2d 644, 646 (7th Cir.1986):

> Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome.

Of course this Court must also recognize that Franklin's appellate counsel may have chosen not to advance every possible due process claim in an effort to streamline the issues for the Illinois Supreme Court. After all, the "process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy" (*Smith v. Murray,* 477 U.S. 527, 536, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986), quoting *Jones v. Barnes,* 463 U.S. 745, 751–52, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983)). In light of the numerous and substantial claims that Franklin's lawyer did advance on direct appeal, that possibility must be given careful consideration.

Examining Franklin's direct appeal reveals that his appellate lawyer raised a number of issues rooted in the same soil as his omitted due process claim. Those issues, which had enough merit to trigger significant consideration in *Franklin I,* involved several assertions:

1. trial court error because the judge did not tell the jury that although murder charges against Williams had been dismissed, that did not bar the State from seeking another indictment at a later date (*Franklin I,* 135 Ill.2d at 87, 552 N.E.2d at 752);

2. trial court error in not instructing the jury about the credibility problems attached to accomplice witness testimony (*id.* at 102, 142 Ill.Dec. 152, 552 N.E.2d at 754);

3. ineffective assistance of trial counsel because he failed to tender an accomplice witness instruction to the court (*id.* at 103, 142 Ill.Dec. 152, 552 N.E.2d at 754–55); and

4. prosecutorial denial of a fair trial through improper remarks during closing arguments (*id.* at 100, 142 Ill.Dec. 152, 552 N.E.2d at 753).

Thus Franklin's appellate counsel challenged some aspects of the prosecution's conduct at trial and also specifically attacked the failure of the judge and Franklin's trial counsel to warn the jury about Williams' credibility and the dangers of accomplice witness testimony. Appellate counsel's focus on the failures of defense counsel and the judge (as opposed to the prosecutor) to provide such a warning is not unreasonable in light of the role that each actor traditionally plays in protecting the defendant. Further, *Franklin I*'s reason for rejecting Franklin's initial claim—that the no-probable-cause finding justified defense counsel's failure to tender an accomplice witness instruction—applies with equal (if not inexorable) force to Franklin's current contention that the prosecutor should have warned the jury.

Similarly, Franklin's second ineffective counsel argument—that Williams had an undisclosed deal with the prosecution—surely does not represent an obvious omission, in the absence of any direct evidence that the prosecution agreed to forbear from a future charge of murder in exchange for Williams' testimony. Moreover, because that claim also rests in part on the assumption that Williams was an accomplice to the crime, the no-probable-cause finding reduces the strength and obviousness of that claim as well. Franklin's appellate counsel could justifiably have decided that other claims had more merit.

Franklin's strongest argument that his appellate counsel omitted a "significant and obvious issue," rather than narrowing the field of claims to a manageable (and perhaps more

persuasive) size, is the fact that a very similar claim worked for Holmes. But it is really impermissible to employ the vantage of hindsight to second-guess Franklin's appellate counsel. And if that fact is removed from the calculus, there is no reason to adjudge Franklin's current version of his due process claim as significantly stronger than those raised on direct appeal, so that he cannot label his appellate counsel's omission as constitutionally ineffective assistance. Accordingly, Franklin has not made the requisite showing of cause such that he can avoid procedural default of his due process claim under Coleman's first possible loophole.

Nor has Franklin shown that he would suffer from a "fundamental miscarriage of justice" because of a failure to entertain his due process claim. That second Coleman exception is limited to the "extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent" (*Schlup v. Delo*, 513 U.S. 298, 321, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), quoting *Murray*, 477 U.S. at 495). Franklin advances no claim of his actual innocence of the murder of Evans (*Steward v. Gilmore*, 80 F.3d 1205, 1212 (7th Cir.1996)), nor do his submissions suggest that.

In sum, Franklin has not demonstrated either cause and prejudice or a fundamental miscarriage of justice such that he can escape procedural default on his due process claim. That claim is denied without reaching its merits.

### Double Jeopardy Claim

Part of Franklin's post-conviction argument that he was denied a fair trial rested on his contention that the post-conviction court was bound by *Holmes*. In particular Franklin contended that the *Holmes* determination that Williams was an accomplice in Evans' murder and was operating under an expectation of leniency estopped the prosecution from contesting those issues. *Franklin II*, 167 Ill.2d at 11, 212 Ill.Dec. 153, 656 N.E.2d at 754–55 rejected that argument, but only after promulgating a new rule that mutuality of parties (which Franklin lacked) was a requirement for the use of collateral estoppel against the State in Illinois criminal cases. Franklin now alleges that the right to use issue preclusion [10] is part of the Fifth Amendment's guaranty against double jeopardy, so that the Illinois Supreme Court unlawfully violated his federal constitutional rights by imposing the mutuality requirement upon him.

Franklin identifies *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970) as the source of a defendant's federal constitutional right to issue preclusion in a criminal case. *Ashe* held that double jeopardy considerations protected a defendant against prosecution for a crime when that defendant had already been acquitted of the same crime (based on the same evidence) against a different victim. In other words, *Ashe* sanctioned the defensive use of issue preclusion (labeled there as "collateral estoppel"): Ashe could constitutionally prevent the State from asserting a claim, in that case the identification of Ashe as the robber, that the State had already litigated against him and lost.

But Franklin wanted to use the *Holmes* holding to foreclose an issue to the prosecution that the State had lost against someone else (Holmes), not against Franklin himself. Such vicarious issue preclusion was not addressed in *Ashe*. More importantly, it was explicitly (and unanimously) rejected in criminal cases by *Standefer v. United States*, 447 U.S. 10, 25, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980). Standefer was charged with aiding and abetting a government agent in accepting unlawful compensation. After that agent had been acquitted of any wrongdoing, Standefer argued that the government should be barred from relitigating the issue of the agent's guilt (*id.* at 21–22). But the Supreme

---

**10.** Although *Franklin II* (like Illinois cases generally) spoke in terms of "collateral estoppel," this Court has always preferred to follow the United States Supreme Court's lead (see, e.g., *Baker v. General Motors Corp.*, —— U.S. ——, 118 S.Ct. 657, 664 n. 5, 139 L.Ed.2d 580 (1998)) by employing the more precise label of "issue preclu-sion" (and its counterpart "claim preclusion," the equivalent of one branch of what the older cases call "res judicata"). This opinion will use the preclusion terminology, except perhaps in referring directly to cases that follow the older locution.

Court (*id.* at 22–23) refused to allow Standefer to apply issue preclusion (again termed "collateral estoppel" in that now–17–year–old case) in that way against the government, reasoning that in the criminal context the government often lacked the "full and fair opportunity to litigate" due to its unique evidentiary and discovery restrictions and its inability to move for a new trial or to appeal.[11] *Standefer, id.,* 447 U.S. at 24, quoting the opinion below, 610 F.2d 1076, 1093 (6th Cir.1979), concluded:

> The public interest in the accuracy and justice of criminal results is greater than the concern for judicial economy professed in civil cases and we are thus inclined to reject, at least as a general matter, a rule that would spread the risk of an erroneous acquittal to all those who participated in a particular criminal transaction.

*Franklin II,* 167 Ill.2d at 14, 212 Ill.Dec. 153, 656 N.E.2d at 755 relied upon *Standefer* and its policy rationales to formulate the Illinois rule requiring mutuality of parties as a prerequisite to applying issue preclusion against the government in criminal cases. That was a reasonable application of federal law to Franklin. *Ashe* did not sanction nonmutual issue preclusion against the government in criminal cases, and the decade-later decision in *Standefer* explicitly forbade that practice.[12] So Franklin had no federal constitutional right to bar the prosecution from relitigating issues decided in *Holmes,* and his double jeopardy claim must be denied.

### Ineffective Assistance Of Trial Counsel Claims

Franklin's third set of arguments is that he received ineffective assistance of counsel at trial because his lawyer (1) failed to impeach Williams effectively with his Will County statement, (2) failed to tender or request an instruction informing the jury that Williams was an accomplice whose testimony should be considered with suspicion and (3) failed to object to improper closing arguments by the prosecution. None of those conditions succeeds either.

Franklin's first sally does not survive the procedural shoals that sink habeas claims. *Franklin II,* 167 Ill.2d at 20, 212 Ill.Dec. 153, 656 N.E.2d at 758 held that he had waived any claim that his trial counsel failed to use the Will County statement to impeach Williams effectively, because Franklin did not present that issue in his direct appeal. As discussed earlier, waiver (or, as stated earlier, forfeiture) is generally an adequate and independent state ground of decision.

In response Franklin asserts that *Franklin II*'s waiver determination is not adequate to block federal habeas review because waiver, as applied to his case, was not "firmly established and regularly followed state practice" as required by *James v. Kentucky.* As in connection with Franklin's due process claim, his argument again depends on his alleged inability to bring his claim on direct appeal because the Will County statement was not in the appellate record. As Franklin raises nothing new here but simply refers back to his earlier efforts, this opinion does the same: It rejects the argument for the same reasons as explained above.

Franklin advances no alternative reason to upset an adequate and independent state ground for decision. In the absence of any showing of cause and prejudice or a fundamental miscarriage of justice, this Court must again respect the state courts and deny that claim on procedural grounds.

**11.** *Standefer, id.* 447 U.S. at 22 distinguished *Blonder–Tongue Labs., Inc. v. University of Ill. Found.,* 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971), which had abolished the issue preclusion requirement of mutuality of parties in civil suits, and *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), which had approved the offensive use of issue preclusion in civil cases by a nonparty in a prior lawsuit, because criminal cases presented different considerations than did civil cases.

**12.** Franklin alternatively argues that *Ford,* 498 U.S. at 424 prevents Illinois from promulgating a new rule requiring mutuality in criminal cases because that defeats his federal constitutional rights. That argument misapprehends *Ford,* which addressed the adequacy of state procedural grounds to bar the consideration of federal constitutional claims. Not only did *Franklin II* duly consider Franklin's collateral estoppel argument, but *Standefer* itself eliminates the basis for his double jeopardy claim. Thus *Ford* is inapposite, and the argument fails.

Franklin's remaining ineffective assistance charges were rejected on their merits by the Illinois Supreme Court after *Strickland*-dictated scrutiny.[13] That being so, those claims must be adjudicated under the stringent standards set forth in Section 2254(d)(1). *Strickland* analysis is a question of balancing, and "when the constitutional question is a matter of degree, rather than of concrete entitlements, a 'reasonable' decision by the state court must be honored" (*Holman v. Gilmore*, 126 F.3d 876, 881–82 (7th Cir.1997), quoting a portion of *Lindh v. Murphy*, 96 F.3d 856, 871 (7th Cir.1996) (en banc) left unaffected by its later partial reversal on other grounds). *Holman, id.* at 882 concluded that "only a clear error in applying *Strickland*'s standard would support a writ of habeas corpus."

Franklin initially lost on the merits of his claim that his trial counsel's failure to tender a witness-accomplice jury instruction was ineffective assistance.[14] On direct appeal *Franklin I*, 135 Ill.2d at 104, 142 Ill.Dec. 152, 552 N.E.2d at 755 concluded that reasonably competent counsel would have found that the no-probable-cause finding objectively suggested no basis for tendering the witness-accomplice instruction. On post-conviction review, *Franklin II*, 167 Ill.2d at 22–23, 212 Ill.Dec. 153, 656 N.E.2d at 759 decided that issue preclusion foreclosed further analysis on the merits of the claim.

While that determination does not outright bar later federal habeas review (*Yancey v. Gilmore*, 113 F.3d 104, 105 (7th Cir.1997)), Franklin has not shown that the *Franklin I* decision was clear error. Although it is true that the prosecution could still re-indict Williams as an accomplice, the combination of the no-probable-cause finding and the failure of the prosecution to try to re-indict Williams could rationally suggest to defense counsel that no such instruction was necessary or likely to be granted.[15] In light of the strong presumption accorded to trial counsel in making strategic choices at trial, this Court cannot say that the *Franklin I* conclusion was unreasonable.

Franklin's third ineffective assistance claim accuses his attorney of failing to object to improper closing arguments by the prosecution at trial. In particular, Franklin argues that his lawyer should have objected to the prosecutor's describing him as an "executioner" and a "professional hit man."

*Franklin I*, 135 Ill.2d at 100–01, 142 Ill. Dec. 152, 552 N.E.2d at 753 denied that claim because the defense counsel's failure to object to the several remarks at trial resulted in a waiver through procedural default (on the one occasion that counsel did object, the court sustained the objection and instructed the jury to disregard the comment), and also because prosecution comments "that are invited and not prejudicial do not constitute error." Here the defense trial counsel asked Williams if he had witnessed a "hit," and Williams answered affirmatively. During closing arguments defense counsel characterized the way that Evans had been killed (one shot to the head and another through the heart) as having "the appearance of an assassination and a hit" (*id.* at 101, 142 Ill.Dec. 152, 552 N.E.2d at 753–54). In light of defense counsel's characterizations and the evidence adduced at trial, the prosecutor's like characterizations of Franklin were both invited and nonprejudicial, and the Illinois Su-

---

**13.** Counsel's performance at the sentencing phase of a criminal case is judged by the same standards established by *Strickland* for the guilt phase (*Eddmonds v. Peters,* 93 F.3d 1307, 1319 (7th Cir.1996)).

**14.** In an effort to avoid Section 2254(d)(1) review Franklin suggests that because the Illinois Supreme Court never considered his two ineffective assistance of trial counsel claims in relation to each other as dependent claims, that Court never addressed the merits of either claim. That argument is disingenuous, as Franklin's briefs to that Court on his post-conviction appeal clearly treat-

ed each element as a separate claim. Having done so, Franklin's present counsel (who also handled the post-conviction proceedings) can scarcely fault the Illinois Supreme Court for having responded in the same way.

**15.** Of course, Franklin argues that the prosecution's failure to re-indict Williams reflects the bargain struck between the two. But in the absence of any direct evidence to support that allegation, defense counsel could reasonably assume that the prosecution did not re-indict Williams on the merits of the case against him.

preme Court's determination is a reasonable one. That claim too is denied.

### Alternative–to–Death Jury Instruction Claim

Franklin next claims that he was denied his Eighth and Fourteenth Amendment rights when the trial judge failed to inform the jury at the sentencing hearing that a natural life sentence was mandatory if they did not impose the death penalty.[16] He also argues that the prosecution misled the jury by emphasizing Franklin's previous parole violations and future dangerousness even though Franklin would therefore have no prospect of release if he were not sentenced to death. Here Franklin's difficulty is that he cannot point to a then-existing federal constitutional basis for his contentions, as reasonable as they are.

 Franklin bases both claims on the holding in *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) that a defendant is entitled to have the jury informed when the defendant is ineligible for parole. Because a mandatory sentence of life imprisonment without the possibility of parole was the only alternative to a death sentence available to Franklin, he urges that *Simmons* required that the jury be told of that fact. There is no question that no such instruction was given.

But before Franklin can take advantage of the court-made rule announced by *Simmons* in 1994, he must show that the rule should be applied retroactively to his earlier conviction. *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) generally forbids federal courts from applying "new rules" of federal law on habeas review. Because Franklin's conviction preceded *Simmons*, he can take advantage of the rule announced there only if he can show that the rule was not new or that either of the narrow exceptions to *Teague* applies.

But now Franklin admits (in his R. Mem. 64–68) that *O'Dell v. Netherland*, —— U.S.

——, 117 S.Ct. 1969, 138 L.Ed.2d 351 (1997) has squarely foreclosed those possibilities. *O'Dell, id.* at 1978 held that *Simmons* pronounced a new rule, that previous Supreme Court precedent did not require that juries be informed of ineligibility for parole and that neither *Teague* exception applied. So Franklin has acknowledged that he cannot get federal habeas relief based upon *Simmons*, and that requires rejection of this claim.

 Franklin does try one alternate tack by arguing that the Illinois Supreme Court violated his Fourteenth Amendment rights to due process and equal protection by refusing to apply *People v. Gacho*, 122 Ill.2d 221, 119 Ill.Dec. 287, 522 N.E.2d 1146 (1988) retroactively to his case. In a foreshadowing of *Simmons*, *Gacho, id.* at 262–63, 119 Ill.Dec. 287, 522 N.E.2d at 1165 held that under Illinois law its trial courts must give a natural life instruction to the jury for a defendant convicted of two or more murders. On the two-years-later direct appeal in Franklin's case, *Franklin I*, 135 Ill.2d at 113, 142 Ill. Dec. 152, 552 N.E.2d at 760 confirmed that the new rule applied only prospectively. Because Franklin's sentencing hearing took place before Gacho announced the new rule, he could not take advantage of its ruling.

Franklin argues that *Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987) mandates that *Gacho*'s favorable ruling must be applied to his case. *Franklin I*, 135 Ill.2d at 114, 142 Ill.Dec. 152, 552 N.E.2d at 760 rejected that contention because the right to a jury instruction on the alternative mandatory sentence of natural life was only a statutory right, not a constitutional one. *Franklin II*, 167 Ill.2d at 23, 212 Ill.Dec. 153, 656 N.E.2d at 760 decided that issue preclusion barred any further review of that claim.

*Griffith*, 479 U.S. at 328 does say that "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct

---

**16.** Franklin had been convicted in 1982 of the 1976 murder of James Roland and had then received a prison sentence of 100 to 300 years. Thus his 1986 conviction for murdering Evans marked the second time that he had been found guilty of first-degree murder. Illinois law man-

dates that defendants guilty of more than one first-degree murder charge must be sentenced either to death or to natural life imprisonment without possibility of parole (730 ILCS 5/5–8–1(1)(c)).

review or not yet final." But that ruling is limited in its application—"*Griffith* only applies to new rules of federal constitutional magnitude" (*Mason v. Duckworth*, 74 F.3d 815, 818 (7th Cir.1996)).

In this instance *Gacho*, 122 Ill.2d at 262–63, 119 Ill.Dec. 287, 522 N.E.2d at 1166 announced its new rule under the supervisory authority inherent in the Illinois Supreme Court. Later Illinois decisions have consistently emphasized that *Gacho* was decided as a matter of statutory construction and not as a constitutional right (see *People v. Steidl*, 142 Ill.2d 204, 245, 154 Ill.Dec. 616, 568 N.E.2d 837, 854 (1991) and cases cited there). And at least when *Gacho* was decided, no United States Supreme Court decision had announced that the absence of an alternative life sentence instruction implicated federal constitutional rights either.[17]

▮ State courts are entitled to refuse to apply new state court decisions retroactively, and the Supreme Court has "reemphasize[d] that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions" (*Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991)). Once more Franklin's claim is denied.

### *Unanimity–of–Sentencing Instruction Claim*

▮ Franklin's fifth claim attacks an oral instruction given by the trial judge to the sentencing jury as a claimed violation of Franklin's right to an informed jury under the Eighth and Fourteenth Amendments. Illinois law allows only unanimous juries to impose the death sentence: If a single juror opposes giving the death penalty, defendant may receive only a term of imprisonment. Franklin contends that the trial court's closing admonitions might have confused the jury and led them to believe that they had to come to a unanimous verdict regardless of whether that verdict was for or against the death sentence.

Franklin raised that claim on direct appeal to no avail. *Franklin I*, 135 Ill.2d at 114–115, 142 Ill.Dec. 152, 552 N.E.2d at 760 rejected the claim on procedural grounds, ruling that he had waived the issue by failing to object to the instruction at the hearing.[18] Because waiver (again more accurately forfeiture) is an adequate and independent state ground of decision, Franklin must bring himself within one of *Coleman*'s exceptions or the claim is procedurally defaulted.

▮ As before, Franklin's sole argument in the latter regard (he abstains from any futile effort at showing a fundamental miscarriage of justice) is that his trial counsel performed ineffectively by failing to object to the trial judge's allegedly deceptive oral instruction. As stated earlier, counsel's performance at the sentencing phase is judged by the same standards as at the guilt phase (*Eddmonds*, 93 F.3d at 1319). In other words, *Strickland*'s cause and prejudice standard applies here as well.

Franklin fails to show either (1) how the outcome of the proceeding would have been different if his trial counsel had objected to the instruction or (2) how he otherwise suffered prejudice as required by *Coleman*. Review of all of the trial judge's instructions to the jury shows that the objectionable remarks, though admittedly confusing in isolation, are not prejudicial when viewed in their proper context.

After the conclusion of the arguments in the aggravation and mitigation phase of sentencing, the jury was given these accurate IPI instructions (*Franklin I*, 135 Ill.2d at

---

**17.** Quaere: If Franklin were really right in contending that the Illinois Supreme Court violated the Constitution by not applying *Gacho* to a some-years-earlier conviction, would that make the United States Supreme Court equally culpable in announcing and applying its *Teague* ruling?

**18.** *Franklin I* also discussed and rejected the merits of Franklin's claim in an alternative holding, but federal habeas review is blocked by the presence of one adequate and independent state ground of decision. Here the Illinois Supreme Court's flat-out and unambiguous holding of waiver plainly satisfies the "clear and express" requirement as to identifying the presence of such state grounds, as announced in *Harris v. Reed*, 489 U.S. 255, 263, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) (see also *Coleman*, 501 U.S. at 735).

115, 142 Ill.Dec. 152, 552 N.E.2d at 760 (citation omitted)):

> If, after all of your deliberations, you unanimously determine that there is no mitigating factor or factors sufficient to keep the death sentence from being imposed, sign the verdict form which states that there is no mitigating factor or factors sufficient to preclude the imposition of the death sentence on the defendant. If you sign this form, the court must sentence the defendant to death.
>
> If, after your deliberations, you are not unanimous in concluding that there is no mitigating factor or factors sufficient to preclude imposition of the death sentence, sign the form of verdict so indicating. If you sign this form, the court will sentence the defendant to imprisonment.

Then the trial judge gave the jury the two possible verdict forms. Each form clearly (and again accurately) explained what conclusions the jury had to reach before signing it. One verdict form ended:

> We unanimously conclude that there is no mitigating factor or factors sufficient to preclude the imposition of the death sentence upon the defendant William Franklin and that the court shall sentence the defendant to death.

And the second form concluded:

> We are unable to conclude unanimously that there is no mitigating factor or factors sufficient to preclude the imposition of the death sentence upon the defendant William Franklin. We cannot unanimously find that the court shall sentence the defendant to death.

After those instructions were given, the trial judge explained to the jury that it could take the exhibits, instructions and jury forms into the jury room during deliberations.

Only at that point did the trial judge utter the disputed admonitions, saying (*Franklin I*, 135 Ill.2d at 114, 142 Ill.Dec. 152, 552 N.E.2d at 760 (emphasis added)):

> After you have *unanimously* agreed upon which verdict form to return, the foreperson will sign the top line of the proper verdict form decided upon and the rest of you will affix your signatures below.
>
> Kindly advise the deputy that you have *unanimously* reached a verdict and you will be brought back into the courtroom to report your verdict.

Those final comments emphasized that every juror had to sign whichever verdict form was applicable. While they alone could also be viewed as having suggested the mistaken notion that unanimity was also required in rejecting the death sentence, they were not delivered in a vacuum.[19] Instead, the judge spoke immediately after delivering the proper jury instructions and providing unequivocal and accurate verdict forms. And importantly, it must be recognized that it takes a skewed view of reality to ascribe permanence to that brief oral passage (which was part of an extended recital of the jury's instructions), when the jury had access only to the correct written instructions and verdict forms (and not to the judge's potentially misleading oral comments) during its deliberations in the jury room. In that context there was no prejudicial judicial error.

Therefore Franklin would surely have derived no benefit even if his trial counsel had objected to the judge's admonitions, and he cannot show that he suffered sufficient prejudice to satisfy *Strickland* (or *Coleman*). Consequently Franklin's claim is procedurally defaulted.

### Ineffective Assistance of Counsel at Sentencing Claims

Finally Franklin asserts that he received ineffective assistance at his sentencing hearing because his lawyer (1) failed adequately to investigate and prepare evidence in mitigation, (2) failed to object to improper evidence and argument by the prosecutor and (3) did not tender an instruction that the only alternative to the death sentence was natural life without possibility of parole.[20] Those

---

19. Ironically, even a federal Court of Appeals has upheld an erroneous instruction by a federal District Judge that had directly conveyed that same incorrect notion—see *United States v.* *Chandler*, 996 F.2d 1073, 1088–89 (11th Cir. 1993).

20. Franklin also claimed ineffective assistance of counsel because his lawyer did not object to

**1180**

claims were originally rejected on their merits by the Illinois Supreme Court after scrutiny under *Strickland.* As explained earlier, Section 2254(d)(1) provides extremely limited habeas review for ineffective assistance claims decided on their merits in the state courts.

Franklin offered seven of his children as character witnesses at his sentencing hearing. Franklin now alleges that he could have presented additional mitigating evidence at the sentencing hearing if his attorney had investigated his background with reasonable diligence. He asserts that effective counsel would have discovered and offered (1) additional character evidence from family members and friends, (2) evidence of his mental illness, (3) evidence of his family's history of mental illness and (4) evidence of his academic achievements in prison.

█ *Franklin II* turned back those arguments after assessing the potential impact of the evidence that Franklin claimed was omitted. Failure to investigate is actionable only if Franklin was prejudiced as a result of counsel's lapse (*Stewart v. Gramley,* 74 F.3d 132, 135 (7th Cir.1996)). *Franklin II,* 167 Ill.2d at 27, 212 Ill.Dec. 153, 656 N.E.2d at 761 decided that Franklin's first strand of missing evidence was merely cumulative and that the latter three were not necessarily mitigating.

█ That reasoning survives under the limited scrutiny afforded by Section 2254(d)(1). First, even when viewed most favorably, Franklin's proposed additional character testimony duplicates what was raised by his children at trial. Second, while Franklin's psychological problems and his family's history of such problems might perhaps evoke compassion, *Franklin II* reasonably concluded that those factors are not unequivocally mitigating (and no United States Supreme Court authority teaches otherwise). Finally, Franklin committed several crimes (including two murders) after he

earned his associate's degree in prison, minimizing the mitigating force of such an achievement.

Franklin next assails his trial lawyer for failing to object to improper closing arguments by the prosecution at the sentencing hearing. Substantively that claim is identical to the one discussed and rejected earlier in this opinion as to allegedly improper prosecutorial comments during trial—the prosecutor simply repeated those same comments at sentencing. *Franklin I,* 135 Ill.2d at 100–01, 142 Ill.Dec. 152, 552 N.E.2d at 753 denied Franklin's second go-round on those allegations because the comments were waived, were invited based on evidence in the record and were nonprejudicial. That ruling was a reasonable one, and that claim is denied as well.

█ Lastly Franklin contends that his sentencing counsel should have tendered a jury instruction informing the jury that as a matter of Illinois law the only alternative to a death sentence was a term of natural life imprisonment without possibility of parole. But as already stated, Illinois law at that time did not require such an instruction: *Gacho* interposed that requirement only after Franklin's sentencing hearing. Any failure to proffer such an instruction is not ineffective assistance, for the "Sixth Amendment does not require counsel to forecast changes or advances in the law, or to press meritless arguments before a court" (*Lilly v. Gilmore,* 988 F.2d 783, 786 (7th Cir.1993)). So that final claim must be denied as well.

*Conclusion*

Facing the ultimate sanction, Franklin is entitled to advance every colorable (or perhaps even noncolorable) argument that might spare his life. Here his appointed counsel have performed yeomen service in raising a host of potential issues, compelling the just-completed extensive analysis.[21]

allegedly misleading jury instructions on the requirement for unanimity, but that claim need not be addressed again in light of the immediately preceding section of this opinion.

**21.** As heavy as the burden of death penalty counsel may be, by definition it is outweighed by the

judicial responsibility for passing on the literal life-or-death issues involved—even despite (or, in an odd way, perhaps because of) the tight constraints that Congress and the higher courts in the federal firmament have imposed on the granting of habeas relief in such cases. And the

But none of the proffered issues survives analysis under the lens that Congress and the controlling case law have prescribed for this Court's scrutiny. Franklin's contentions about lack of a fair trial and unconstitutional unanimity of jury instructions, as well as one of his ineffective assistance of trial counsel claims, have been procedurally defaulted because they were decided on adequate and independent state grounds by the Illinois Supreme Court. Franklin's surviving claims were addressed and resolved on their merits by the Illinois Supreme Court in decisions that were neither contrary to, nor involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, nor were they based on an unreasonable determination of the facts in light of the evidence presented in state court. In sum, Franklin's Petition is denied and his action is dismissed.

burdens are enhanced rather than lightened where as here a constitutional argument is proffered that a respected Illinois Supreme Court justice has found persuasive and that has substantial substantive force, but where the constraints on federal judicial power force its rejection on grounds other than the merits. For those reasons and others, special credit must be accorded to this Court's first-rate law clerk Christopher Niewoehner, Esq., for his fine work in structuring a proposed draft of this opinion, deal-

ing effectively with the multitude of complex issues posed by the case. Having said that, this Court hastens to add (as it always does in paying tribute to its invariably outstanding law clerks) that it has painstakingly reworked each sentence and read each case cited in this opinion (and, of course, other cases as well), so that the end product is totally this Court's own. If then there are any errors that have found their way into the final version of this opinion, the sole responsibility is this Court's and not that of its law clerk.